WILLIAM STUHR v. JAMES CURRAN.

S. and C. were opposing candidates for the office of chosen freeholder. C. received the certificate of election from the board of canvassers, and performed the duties of the office for six months, having no reason to doubt that he was legally elected. He was subsequently ousted by S. on *quo warranto. Held,* that an action cannot be maintained by S. against C. to recover the fees of the office received by the latter while he was in possession of the office.

In error to the Supreme Court.   The facts appear fully in the opinion of the court.

For the plaintiff in error, *W. S. Stuhr.*

I. The compensation of a public officer is incident to the *true title,* and not to mere occupancy. *People* v. *Tieman,* 30 *Barb.* 193; *S. C.,* 8 *Abb. Pr.* 359; 4 *Abb. Dig.* 206; *People, ex rel. Dorsey,* v. *Smith,* 28 *Cal.* 21; *Auditors* v. *Benoit,* 20 *Mich.* 192; *People* v. *Miller,* 24 *Mich.* 459; *Comstock* v. *City of Grand Rapids,* 40 *Mich.* 397.

II. Election of an eligible person confers upon him the right, the title to such office. The certificate of election is the mere evidence of such title. *Glascock* v. *Lyons,* 20 *Ind.* 1; *Magee* v. *Supervisors,* 10 *Cal.* 233.

III. A person who is rightfully entitled to an office, although not in the actual possession of it, has a property in it as against a mere intruder, who may perform the duties of the office for a time, and receive the fees or salary arising therefrom; he may maintain an action for money had and received to recover such fees or salary, and such intruder cannot retain any part thereof as compensation for his labor. *Glascock* v. *Lyons,* 20 *Ind.* 1; *Dolan* v. *Mayor,* 68 *N. Y.* 274; *S. C.,* 23 *Am. Rep.* 168.

For the defendant in error, *J. H. Lippincott.*

I. An office and the prospective fees of the officer are not property ; the right to fees and salary grows out of services performed. *Smith* v. *New York,* 37 *N. Y.* 518 ; *Harley* v. *Mayor,* 33 *N. Y.* 607 ; *Wayne Co.* v. *Benoit* 20 *Mich.* 176 ; *Jarvis* v. *Mayor,* 2 *N. Y. Leg. Obs.* 396 ; *Connor* v. *Mayor of N. Y.,* 5 *N. Y.* 285 ; *Queen* v. *Mayor of Cambridge,* 12 *Ad. & El.* 702 ; 1 *Dill. on Mun. Corp.* (*3d ed.,*) § 229, *and cases cited in note* 2.

II. There is a clear distinction taken by the authorities between an office held *de facto* under color of title, and one usurped without any legal pretext. *Wayne Co.* v. *Benoit,* 20 *Mich.* 176, 185 ; *Plymouth* v. *Painter,* 17 *Conn.* 585 ; *Wilcox* v. *Smith,* 5 *Wend.* 231 ; *Carleton* v. *People,* 10 *Mich.* 250.

III. The defendant was entitled to receive from the county collector, the disbursing officer of the county, his salary as chosen freeholder from May 1st to November 1st, the latter date being the time when he gave up his office and the plaintiff took it. *Dolan* v. *Mayor,* 68 *N. Y.* 274 ; *Wilcox* v. *Smith,* 5 *Wend.* 234 ; *cases cited on first two points.*

IV. If there be a right of recovery at all in the cause, it would be as damages, and not for money had and received. *Glascock* v. *Lyons,* 20 *Ind.* 1 ; *Dolan* v. *Mayor,* 68 *N. Y.* 274.

V. Both plaintiff and defendant held office under an act of the legislature of the State of New Jersey, entitled " An act to re-organize the board of chosen freeholders of the county of Hudson," approved March 23d, 1875, (*Pamph. L., p.* 324,) which provides that there shall be elected in the county of Hudson two chosen freeholders from each assembly district. They must give bonds in the sum of $10,000 each ; bonds to be approved by a justice of the Supreme Court ; and they also must take an oath of office before a justice of the Supreme Court. All this the defendant did before he was allowed to take his seat. This bond is given and oath taken

by virtue of the declaration of the board of county canvassers provided for in this act. The act then provides "that the said members of the board of chosen freeholders shall receive, *as a salary* and compensation for their services as members of said board, the sum of five hundred dollars each per annum, * * * such salaries to be paid out of the county treasury by the county collector, in equal quarter-yearly payments, as the same become due; and such salary shall be in lieu of any *per diem* heretofore allowed, and in lieu of all other fees for committee or otherwise, perquisites, carriage-hire or traveling expenses or personal entertainment whatever, and no other compensation shall be allowed or given or paid to any of said members * * * for any services or expenses whatever."

Under this statute the compensation is an incident to the service, and the defendant having, under a legal title, (not being a mere intruder,) performed the same, is entitled to the salary against all. The salary or compensation is set off against service and expenses, by the statute.

Van Syckel, J. Stuhr and Curran were opposing candidates for the office of chosen freeholder from the seventh assembly district of Hudson county, at an election held April 13th, 1875. The board of county canvassers declared that Curran was elected, whereupon he gave bond, took the oath of office, and served as chosen freeholder from May 4th, 1875, until November 4th, 1875.

On the 12th of May, 1875, Stuhr commenced *quo warranto* proceedings against Curran, and succeeded in ousting him by the judgment of the Supreme Court, rendered November 4th, 1875.

This suit is instituted by Stuhr to recover from Curran the salary which the latter received from the county collector while he occupied the office and discharged its duties.

A critical examination of the adjudged cases will show that

the question involved is not so trammeled by authority that this court is precluded from adopting the rule which best accords with sound reason and a wise public policy.

In Bacon's Abridgment it is said that an action for money had and received will lie by the rightful officer against an intruder, for the fees of the office which the latter has appropriated. The only case cited in support of this *dictum,* is *Boyter* v. *Dodsworth,* 6 *Term R.* 681. In that case, the plaintiff had a property in the office of sexton of the cathedral of Salisbury, holding it by grant for life, under two patents dated in 1777, for which he paid a valuable consideration. The defendant was a mere intruder, without any apparent right, who, while in occupation of the place, had received from visitors certain gratuities, for which the plaintiff brought his suit. All that the case decides is that an action will not lie to recover such gratuities.

In *Powell* v. *Milbank,* reported in a note to 1 *Term* 399, *note d,* the action was brought to recover the profits of the curacy of Chester Le Street received by the defendant, the plaintiff having title to the curacy under a grant.

*Howard* v. *Wood,* 2 *Lev.* 245, is also a case where the plaintiff held the office by grant. The court said that two or three actions of this kind, for money had and received, had been upheld, but, at the importunity of the attorney-general, the case was further adjourned without judgment, and it does not appear in the books what the outcome of it ultimately was.

These cases have been manifestly misapprehended in some of the American courts, where they are cited in support of the broader doctrine that such action will lie in all cases by the party who is ultimately decided to have been elected, against one who has wrongfully occupied a public office, for the compensation he has received for performing its duties. For so wide a rule they clearly furnish no support whatever.

They all relate to offices which the plaintiff might have held to him and his heirs, in which he might have had an estate to which his representatives would have succeeded. They cannot be likened to public offices in this country which

concern the administration of justice, and in which it is well settled that an incumbent can have no right of property.

This is the utmost that can be extracted from any English case, and amounts merely to an enforcement of the doctrine that one who takes the property of another must respond for its value.

To apply the rule which admittedly flows from a recognition of the existence of a vested estate in an office to instances where such right of property is not acknowledged, is a palpable perversion of legal principles. Any argument which attempts to engraft upon the latter the consequences which attach to the former must be fallacious and misleading. Nor have I been able to find an American case which applies this doctrine to a state of facts like that presented by this controversy.

*Allen* v. *McKean*, 1 *Sumn.* 277, related to an office in Bowdoin College, a private, and not a political corporation.

Mr. Justice Story, in delivering the opinion of the court, after speaking of the distinction between private and political corporations, said that Allen, the plaintiff, was in office under a lawful contract to hold during good behavior, with a fixed salary and certain fees annexed, and that this was a contract for valuable consideration, which could not be impaired by legislation. This case was precisely like the English cases, and they were cited in support of the judgment of the court, which was correctly rendered in favor of the plaintiff.

In *Benoit* v. *Auditors of Wayne County*, 20 *Mich.* 176, the only question was whether the *de jure* officer could recover from the county the salary for the period during which he was evicted by the *de facto* officer, to whom the salary had been paid. To this the court gave a negative answer.

In the subsequent case of *Comstock* v. *Grand Rapids*, 40 *Mich.* 397, the *de jure* officer was permitted to recover the salary for the entire period, no part of it having been paid to the unlawful occupant.

On the determination of *quo warranto* proceedings in favor of the relator, in *People* v. *Miller*, 24 *Mich.* 458, the court

assessed his damages against the intruder at the full amount of fees which the latter had received.

These cases in Michigan are entitled to little weight in this discussion, as the statute law of that state (*Comp. L., vol. II., p.* 1961, § 7080,) directs the court, when the title of the relator is established on *quo warranto*, to give him such damages against the *de facto* officer as he has sustained by the ouster.

In *Dorsey* v. *Smyth, County Auditor*, 28 *Cal.* 21, the court required the auditor to pay the *de jure* officer the salary for the period during which he had been ousted, although payment had previously been made to the *de facto* officer. *Stratton* v. *Oulton*, 28 *Cal.* 44, is a like case.

The case of *Glascock* v. *Lyons*, 20 *Ind.* 1, came up on demurrer to a complaint which charged that the defendant fraudulently usurped the office, and converted the fees to his own use. The court, in adjudging for the plaintiff, stated that "it treated the case as resting upon the facts averred, and by the demurrer admitted to be true, namely, that the plaintiff was duly elected, and justly entitled to the office, but that the defendant had obtained the evidence of title thereto through deceit, falsehood and fraud, and thereby had intruded into the same, and was usurping the duties thereof. Under these circumstances, we are not able to perceive any good conscience there would be in permitting the defendant to retain the salary of the office."

In *Douglass* v. *State*, 31 *Ind.* 429, the *de jure* officer had his damages against the intruder, although no fraud was imputed to the latter. But the value of this case as an authority disappears when it is observed that the Indiana statute gives the successful relator in *quo warranto* the right to recover such damages. In the case last cited, the principal question was as to the proper measure of damages. Justice Elliott does not notice the statute in his opinion, but it must have had a controlling influence on his decision, as Justice Gregory, in his opinion in the same case, recites the statute, and deduces his rule of damages from its language.

In *Hunter* v. *Chandler*, 45 *Mo.* 452, judgment was rendered for the plaintiff upon a demurrer by the defendant, admitting the allegations of the petition, that " the plaintiff was duly elected and qualified as city attorney, and entitled to the emoluments of the office ; that the defendant had usurped and intruded into the office, and received the fees thereof to and for the use of the plaintiff; and that, as soon as the information in the nature of a *quo warranto* was filed against him, the defendant vacated the office, and disclaimed all right thereto."

The defendant thus, by his own admission, occupied the attitude of a mere usurper, without apparent right, who had received money for the use of the plaintiff.

The *de jure* officer, in *United States* v. *Addison*, 6 *Wall.* 291, recovered from the intruder the fees which accrued and were received by him after the court had decided that he was not entitled to the office.    The judgment was rendered in a suit upon a bond given by the intruder when he took his writ of error in the *quo warranto* proceeding, conditioned to answer all damages, if he failed to make good his writ.

The case of *Dolan* v. *Mayor*, 68 *N. Y.* 274, is authority only for two propositions—

*First.* That disbursing officers, charged with the duty of paying official salaries, have, in the exercise of that duty, a right to rely upon the apparent title of an officer *de facto*, and to treat him as an officer *de jure*, without inquiring whether another has the better right.

*Second.* That the *de jure* officer, when he recovers possession of the office by *quo warranto*, is entitled to receive from such disbursing officer so much of the salary as at that time has not been paid to the intruder. ·

In New York, as in Michigan, the statute law provides that in proceedings in the nature of *quo warranto*, if judgment be had in favor of the person claiming title, he may recover of the intruder the damages he shall have sustained by reason of the usurpation.

In California, likewise, the following provision is found in the *Quo warranto* act :

" That if judgment be rendered upon the right of the person alleged to be entitled, in favor of such person, he may recover by action the damages which he shall have sustained by reason of the usurpation of the office by the defendant." *Gen. L. of Cal.* 1850 *to* 1864, § 5252.

The Louisiana *Quo warranto* act contains the same provision, and therefore it is deemed to be unnecessary to refer to the cases in that state in which the subject under review has been discussed. *Rev. Stat. of La.* 1870, *p.* 512, § 2600.

In some of these American cases there are *obiter dicta* that an action for money had and received will lie in favor of the person entitled to the office against the *de facto* officer, but such declarations are based either upon *statutory* law or upon the mistaken assumption that they are justified by the English authorities which have been referred to.

These observations of the courts in California, Indiana, Michigan, Louisiana and New York, lose their force as controlling authorities as to the state of the common law when it is considered that in those states the remedy sought to be enforced here is expressly given to the suitor by statute.

In New Jersey there is an entire absence of any like statutory enactment to uphold the plaintiff's case.

From this presentation of the adjudications, which embraces the principal cases, it is manifest that in this state we are free to adopt what shall be conceived to be the better rule.

In England, offices are incorporeal hereditaments granted by the royal favor, and are the subjects of vested or private interests.

In this country they are not held by grant or contract, nor has any individual a property or vested right in them beyond the constitutional tenure and compensation. They are mere agencies of a political nature, created by appointment or election for the discharge of public functions. The incumbent cannot sell his office or encumber it, nor will it pass by an assignment of his property. The right to the fees or com-

pensation does not grow out of any contract between the government and the officer, but arises from the rendition of the services. 5 *Wait's Act. and Def.* 1; *Conner* v. *Mayor*, 5 *N. Y.* 285; *Smith* v. *Mayor*, 37 *N. Y.* 518; *City of Hoboken* v. *Gear*, 3 *Dutcher* 279.

The plaintiff in this case being without any property in the subject of the suit, and no privity existing between the parties, upon what basis can this action be rested?

If in a legal sense he had a right to the emoluments of the office as incident to his title, payment of them to another could not discharge the obligation of the government to pay him. Such right in the *de jure* officer was denied in the Dolan case, where the New York Court of Appeals, in conformity with public policy and the weight of authority, held that payment to the incumbent was an acquittance to the municipal corporation.

It would, however, be far more just and accordant with legal principles that the public treasury should respond to the plaintiff here, than that the loss should fall upon the defendant, for it was through the mistake of the officers of the law, and not by the defendant's fault, that the plaintiff has been subjected to the deprivation of his office. If fraud was imputable to the defendant, the case would present a different aspect, but there is no pretence of bad faith on his part upon which to found a recovery. The unquestioned rule that mistake of the law excuses no one, and that the appropriation of another's property under the honest belief by the wrong-doer that it is his own, furnishes no defence, has not the slightest application here. The distinction is too obvious to escape even casual observation. In what respect did Curran mistake either law or fact? He took possession of the office upon the assumption that he was declared duly elected by the board legally constituted to decide that question. In this he was not in error, for the fact is conceded to be so. He acted, not upon the fact of his election, but simply upon the fact that he was declared to be elected.

As to the law he made no mistake, for it will not be denied

that, as matters then stood, it was his imperative duty to accept the fact to be as found by the board and to occupy the place. A refusal on his part at that juncture would have been attended with the risk of an indictment, or the enforcement of a penalty against him.

The tribunal legally constituted, primarily, to determine who was elected, awarded the certificate of election to Curran. He contributed to that result by no improper act of his own. He was a candidate for the office, as he had a right to be, but did not put himself in, nor did he keep Stuhr out. After he was returned elected, he would have been subject to a penalty for refusal to serve in the office. He did no illegal act; he did nothing but submit to the command of the law. He went in when the proper tribunal so adjudged, and went out promptly on the day the adverse decision came. The *quo warranto* investigation might have resulted in continuing his tenure of the office. He could not anticipate the issue of the litigation, and if he could have done so, he could not have acted otherwise than he did. Until its determination he was under a legal obligation to discharge the duties of the office, and could not voluntarily surrender it without the risk of forfeiting his estate. If he had refused to perform the duties of the office, Stuhr would not have been permitted to do so until judgment was rendered in his favor. Even in the event of Curran's refusal to serve, the law provided for the appointment of an incumbent, who would have served until Stuhr established his title. If this action can be maintained against Curran, recovery could also have been had against the person appointed in case of his refusal to serve. Can a rule which necessarily leads to such a conclusion be well founded? The public interest must suffer unless the office is filled, and as no one but he who is apparently elected can be permitted to occupy it and discharge its duties, how can it be said that, *ex æquo et bono*, he should pay the compensation for the time he is thus in the office to one who has borne none of the labor incident to it?

It cannot be successfully asserted that Curran was in the

wrong. He had no means of ascertaining whether the board of canvassers had erred in certifying to his election; that was a question for judicial determination. His position was totally unlike that of a person who, having a defective title to lands, enters into possession and receives the rents and profits. The distinction is boldly defined; the similarity not readily discernible. In the land there is a right of property of which the products are part and parcel. In the office this controlling feature is absent. In the former the recipient is absolutely free to act; in the latter the law makes it his duty to accept the position as the apparently-elected candidate, and he can decline only at the peril of punishment if he errs in supposing that he is not lawfully chosen. The profits of lands for which he must respond are their fair value in excess of that of the labor reasonably bestowed upon their production. The emoluments of office are presumed to be nothing more than an equivalent for the labor it imposes, so that, even conceding the parallel, the incumbent gives in service as much as he receives in fees, and it is *damnum absque injuria*.

No countenance should be given to the notion that public offices are created for the benefit of office-holders. In this country, where the cases almost uniformly discard the idea of proprietary interest in such offices, the logical sequence is that the right to emolument must be regarded as having no legal existence except as arising out of the rendition of services for which they are compensatory.

The case of intrusion by fraud rests upon legal principles which do not apply here. Public policy would require that the fraud-doer be not encouraged by deriving gain from his dereliction.

To permit the plaintiff to recover in this case would be an anomaly. No other instance can be suggested where a party, required by law to perform a service, can be deprived of the just compensation paid to him for it. Obedience to the law cannot, upon any just application of legal principles, make him liable to an action of tort, nor leave him subject to be stripped by suit of that which he has fairly earned in the

law's service.    To induce a court of justice to lend its aid to the enforcement of a demand so inequitable in its character, an array of authority should be produced which well nigh precludes controversy.    The plaintiff affirms his legal right, and the burden rests on him to establish some stable foundation for it.

The rule contended for by the plaintiff would operate so harshly upon the defendant that it does not commend itself as an equitable proceeding, and no case has been cited which constrains us to sanction a recovery upon the facts of this case.

That the English cases throw any light upon the real point at issue, or furnish any rule for our guidance under the circumstances here developed, cannot be conceded.    The material facts here being so dissimilar, those cases do not appear to me to be entitled to serious consideration as controlling authorities.

The imputation cannot be cast upon the law that it is so hard and unconscionable a task-master that it exacts the service and withholds the wages.    Under the facts disclosed in this case, an action will not lie against the *de facto* officer.    He yielded obedience to the law when he performed the service, and on principles of natural justice he may retain the reward he has received.

The judgment below should be affirmed.

BEASLEY, CHIEF JUSTICE, (dissenting.)    The legal question presented by the facts of this case is whether an officer *de jure* can maintain an action against an officer *de facto*, by reason of the intrusion of the latter into the office and the receipt by him of the emoluments.

In the opinion of the majority of the court the law does not afford such a redress, unless it is made to appear that such intruder was aware at the time of his taking possession of such office that he had, in point of fact, no legal title to it.    In that conclusion I find myself, after a careful examination of the subject, unable to concur, the grounds of my dissent being

that it seems to me opposed to settled authority and inconsistent with established legal analogies and principles.

First, then, with regard to the subject considered in the light of authority. After the investigation I have given this matter, not a doubt is left in my mind that, at the era of the American revolution, it was conclusively settled by the common law decisions that an officer *de jure* was possessed of the right of action in question, and these judgments are as authoritative as would be similar decisions in our own courts. These English adjudications are entirely uniform, and run through three or four centuries. Indeed, the rule was so indisputable that we find it stated as the settled law in legal treatises of distinction and in the ordinary books of practice. The following is the statement of the law as expressed by Jacob in his Law Dictionary, title, " Office :" " An action by a person claiming an office against the person in actual possession and receiving the fees, is, perhaps, the most eligible method that can be pursued to try the question of right." This work was published as early as 1729. To the same effect is the language of Selwyn. 1 *N. P.* 81. He says : " That where a person has usurped an office belonging to another, and taken the known and established fees of office, an action for money had and received will lie at the suit of the party really entitled to the office, against the intruder, for the recovery of such fees." So, Chitty, (1 *Pl.* *100,) speaking of the action of *assumpsit*, says such action will lie " against a person who has usurped an office and received the known and accustomed fees of office."

A reference to the following cases, beginning with one as ancient as the reports of Dyer, will amply suffice to show that these writers have correctly interpreted and expressed the law as it is contained in the judicial opinions and judgments of the English courts : *Vaux* v. *Jefferen*, 2 *Dyer* 114 ; *Pybus* v. *Mitford*, 1 *Mod.* 122 ; *Howard* v. *Wood*, 2 *Lev.* 245 ; *Arris* v. *Stukeley*, 2 *Mod.* 260 ; *Lee* v. *Drake*, 2 *Salk.* 468 ; *Boyter* v. *Dodsworth*, 6 *T. R.* 681 ; *Webb's Case*, 8 *Rep.* 45 ; *Green* v. *Hewitt*, *Peake* 182.

For the purpose of elucidating the views hereinafter to be expressed, I will refer particularly to but one of the cases above cited, that is, to the decision in *Arris & Arris* v. *Stukeley*, 2 *Mod.* 260. This suit was in *indebitatus assumpsit* for moneys received for the use of the plaintiffs. The controversy related to the fees of an office—the comptrollership of the customs—which had been received by the defendant under a claim that he held such office, as a right, by virtue of a grant to himself and another, which latter grantee having died, and the question was whether such office survived. The plaintiff in the case had been appointed after the death of such grantee. The decision was that as the grant was to two persons during their lives, there was no survivorship, and that as the defendant had no title, and had received the official fees, he must pay them to the plaintiff, who was the officer *de jure*.

It is to be noted that in this case the only fault of the defendant was his continuing in this office under a mistaken claim of right; there was no pretence that he acted oppressively, or deceitfully, or even carelessly, or was conscious of wrong-doing. He had executed the office supposing he had the right to do so, and had by his labor earned the fees, and they had been paid to him; and yet it was held that the plaintiff, as the *de jure* officer, was entitled to recover them from him. I am unable to distinguish this and similar cases from the controversy now pending; they seem to me authorities directly in point, and in my judgment they cannot properly be either disregarded or overruled by this court.

I am aware that it is insisted that a distinction is to be drawn between these offices as they exist in England and as they exist in this country. This position is founded on the alleged fact that these common law offices are property, incorporeal hereditaments, and that such a quality is not attributable to their American counterparts. But if we look a little closely into the matter we will discover that this supposed difference is more nominal than real. It is true that most English offices run for longer terms than is usual with us, but it is only offices for life, or for longer terms, that are hereditaments, and for which an assize at common law would lie. It would, I

think, be difficult to point out the proprietary characteristic by which one of these foreign offices which endure only for a period of years is to be discriminated from a domestic one of the same extent. Even those which are hereditaments, when we look at them in the light of being technical property, present in this aspect but a mutilated appearance, for most of them can neither be bought, nor sold, nor encumbered, nor assigned; and yet these capabilities are the principal advantages and incidents of property, so that an office destitute of them appears to be nothing more than a franchise to hold possession of the station, and, upon the performance of its duties, to receive its emoluments. When, therefore, it has been asserted in judicial discussion that offices are not property in this country, such remark, admitting its correctness, does not point to any radical difference between such offices and those of foreign origin. It is granted that, with respect to the public authority, a right to an office in this country is not a vested right, or one dependent on contract, and that, consequently, an incumbent of such a situation cannot legally complain, on general principles, if such office be abolished or the salary diminished during his term. There are a number of decisions to this effect, and there can be no question as to their correctness. But because the sovereign power can destroy or impair such official rights, is it a logical consequence that they therefore can be destroyed or impaired by individuals? And even in the respect just designated, are not English offices held by a similar tenure, for will it be asserted that such public interests may not at any time be modified or abolished by act of parliament? In the light of this interrogatory, let us look at the most recent case among the decisions above cited. It is that of *Lawlor* v. *Alton*, 8 *Ir. R.* 160. The plaintiff and defendant were candidates for the office of surgeon to the infirmary of the county of Kerry, and the governors of that institution, by mistake, declared the defendant elected, and he thereupon executed the office for a time and received the salary appertaining to the post. On *quo warranto*, the defendant's title having been adjudged to

be bad, the plaintiff, who was thus shown to be the officer *de jure*, brought suit against the intruder. A judgment was rendered in his favor. There was in this case neither allegation nor pretence of *mala fides* in the defendant. He received a salary, payable in instalments, for his services.

Now, is it reasonable to say that there is any real distinction between the rights of the plaintiff in this reported case and those of the plaintiff in the present case? I have failed to perceive even the faintest line of demarkation between the two instances. There seems no ground to believe that there was any more property, in the strict sense of the term, in the office in the one case than in the other. In every respect the parties appear to stand on the same footing; in each case the plaintiff had been legally elected; in each the defendant, unconscious of wrong-doing, had intruded and taken the fees. That is the situation, and how different results from these same premises are to be justified is to me a problem not to be solved.

But, in reality, I do not consider the question whether or not a difference in the proprietary rights to office exists in the two countries, as of the least importance to the present discussion. Granted that such a discrimination can reasonably be made, how does it affect the pending question? So far as relates to the matter in hand, it is a distinction without a difference. The only point of inquiry is, does the office-holder at common law, with respect to an intruder, have a greater right to the possession of his office than an American office-holder does? Can this be reasonably contended for? Can anything be more complete than the right of the holder of an office in this country to the enjoyment of his office and to its emoluments? If he possessed the capacity to sell or encumber the office, or was the proprietor of the office in the largest sense, such incidents could not add anything to his title to the immediate enjoyment of the position and its products. The remedies which exist in this state for the enforcement of the right of possession of the office-holder, show the perfection and completeness of such rights; if admission into his post be re-

fused him, he has his remedy by the prerogative writ of *man-damus*, and in case of an intrusion he can cause the usurper to be expeled by the force of the writ of *quo warranto*. Nor do I see any reason, except the obsoleteness of the method, if the office be for the term of the incumbent's life, why he could not, in order to gain possession, resort to a writ of assize. Is it even plausible to contend that the plaintiff, in the case just cited from the Irish Reports, who was elected to the position of surgeon in the infirmary, had a more absolute or perfect right to enter into such office and take its profits than the plaintiff in this case had to take possession of and enjoy the office to which he was legally elected? With respect to such a point, the assertion that in the one case the office is property and in the other that it is not, even admitting the assertion to be founded in fact, conveys no meaning whatever to my mind. For the question is not whether the plaintiff had a right of property in the office, but whether he had a right to its occupation and its profits? If he had that right, such right can no more be invaded with impunity than can a right of property be so invaded. The English decisions rest entirely on the ground that the officer *de jure* has the right to the possession and proceeds of the office; and I find no allusion whatever in any of them to the so-called proprietary right.

For these reasons I am of opinion that the rule of law, being entirely established at the time of the separation of this state from the mother country, cannot be here overthrown except by legislative enactment. In concluding my comments on the force and operation of this train of judgments on the question under consideration, I will remark that in none of the numerous American decisions that have been examined by me do I find it anywhere declared or intimated that such judgments rest on grounds that render them inapplicable in this country; but, so far as I have observed, they have been on all occasions looked upon, with respect to the right of the *de jure* officer to sue an intruder, as controlling precedents, to be implicitly followed. It is singular, indeed, if there be any such fundamental difference as is now

supposed to exist between foreign and domestic offices, that such difference has never before been discovered.

With regard to the American cases, I can say, after an extended research, that not one of them that has come to my attention, denies the right of the *de jure* officer to recover, in some form, for an intrusion into his office. Nor is there in such judgments any distinction recognized between an intrusion originating in venial error or in unlawful design. Among these cases it is true there is some contrariety of opinion as to what should be the measure of damages in such suits, but touching the right of action, they are in complete accord with the common law decisions already cited, and they refer to such decisions as authority. In this line of cases the decision in *Dolan* v. *Mayor of New York*, 68 *N. Y.* 274, is worthy of particular notice. The plaintiff, Dolan, was lawfully elected an assistant clerk of the Sixth District Court of the City of New York, but was excluded from the office by one Keating, who claimed under an appointment of a justice of that court. By virtue of a judgment of *ouster* in an action of *quo warranto*, the plaintiff came into possession. During the time of this unlawful occupancy of Keating, part of the salary of the office had been paid to him, and part of such salary earned by him remained unpaid. The plaintiff sued the city for both parts of such salary—that part which had been paid to Keating and that part which remained unpaid. The decision of the court was that the plaintiff was not entitled to recover from the city the moneys which had been actually paid to the intruder, on the ground that the city had the right to make such payments, as such intruder was a *de facto* officer, but that the moneys earned by the services of such intruder, and which remained in the hands of the city, were lawfully due to the plaintiff, and for such sum judgment was rendered in his favor. The case, in principle, is directly applicable, and if it was regularly decided, the plaintiff in the pending action has the right to a decision in his favor. In the reported case there was no pretence that the defendant had done anything with knowledge of its unlawfulness; on the contrary, the

judge who read the opinion entirely exonerates him in that respect, for he says: " The appointment of Keating was not a plain usurpation without legal pretext or color of right. The statute was obscure; the power of the justice to remove an incumbent at pleasure and make a new appointment was a question upon which the courts differed." Standing in this posture of innocence, so far as intention was concerned, it was nevertheless held that the moneys earned by him went legally to the *de jure* officer. This result is reached by the Court of Appeals on the ground of the prevalence of the common law doctrine already stated, and 'both English and American decisions are cited in support of such doctrine. The statement of this rule of law is made with great directness. " Actual incumbency merely," says the opinion, " gives no right to the salary or compensation. The right of the intruder to recover is denied, not upon the ground of actual fraud on his part, for it often happens that he is in not only under a claim of right, but under a *prima facie* title, which he cannot or may not know to be invalid; nor upon the ground that he is a mere volunteer and that the government should not be obliged to pay him for his services, for in most cases they are rendered in good faith, and under the expectation, both on his part and on the part of the public, that he is to receive the emoluments of the office. The principle is, that the right follows the true title, and the courts will not aid the intruder by permitting him to recover the compensation which rightfully belongs to another. That an officer merely *de facto* has no right to the compensation of the office, also clearly appears from the consideration that if he obtains it he is liable on an action for money had and received by the officer *de jure* to recover it." This case undeniably acknowledges and adopts the common law doctrine in its entirety.

The same view of this subject was taken by the Supreme Court of Missouri, in *Hunter* v. *Chandler*, 45 *Mo.* 452. It was an action by a lawfully-elected city attorney against an intruder, who was in under a color of right, for the perquisites of the office; and, although the suit failed of its object,

in consequence of the plaintiff having omitted to have his right to the office previously settled, the general principle of law warranting a recovery was affirmed. The defendant was in the office under a commission, so that there was no ground to assert that he was holding *mala fides*, and the case was not decided on any such consideration, but, on the contrary, the English cases were cited and their doctrine maintained. The language of the court is this : " The question has been mooted whether an action of this kind was maintainable. About this I have no doubt. The authorities abundantly establish the principle that an action for money had and received will lie in favor of a person really entitled to an office, against one who has usurped and intruded into the same, for the recovery of the known and fixed fees that such intruder may have received." The opinion then cites some of the English and American cases, and continues : " The doctrine which underlies these cases, and upon which the rule rests, is that, if one man receives money which ought to be paid to another, or belongs to him, the action for money had and received will lie in favor of the party to whom of right the money belongs." This is very plainly an adoption of the common law rule in its full vigor.

Nor does it appear to me that the decision of the Supreme Court of the United States in the case of *United States* v. *Addison*, 6 *Wall.* 291, can be made to harmonize with any other doctrine. The facts were these : Crawford was elected mayor of Georgetown, but Addison was returned as elected by the judges of election, and was sworn into office. On a *quo warranto*, judgment of ouster was given against Addison, who thereupon brought a writ of error, giving the customary bond, with a condition " to prosecute the said writ of error with effect, and to answer all damages and costs, if he shall fail to make his plea good." On the trial of a suit on this bond, the judge was asked in behalf of the plaintiff to charge the jury, " that if they should find that, during the time in which Addison acted as mayor, he received the salary, and that he did not prosecute his writ of error with effect, then

that the plaintiff was entitled to recover the amount so received, and interest on it, provided they should also find that Crawford was duly elected and qualified as mayor, and that he continued, and was ready and willing to discharge his duties, and was only prevented from so doing by the interference of Addison, and by his assuming to exercise the functions of his office." This instruction the judge refused to give, but, on the case coming before the Supreme Court, it was decided that such refusal was erroneous. I do not understand on what legal basis that conclusion is to be placed, if it be not the common law doctrine above stated. The bond was conditioned to pay the damages, but how were the moneys received by the incumbent for services performed to be deemed such, except upon the theory that he was a usurper, and that the officer *de jure* was entitled in law to the proceeds of the office? Legal damages are such losses or detriments as the law compensates in consequence of a wrong committed; and the only wrong committed by the defendant in question was his taking possession of an office to which, as it eventually appeared, he had no title; for it would be contrary to all true principle to hold that his carrying up his case to a court of review was, *per se*, a legal wrong. The injury to the plaintiff was the receipt by the defendant of moneys which should have come to him, the plaintiff, and it was that injury which the Supreme Court maintained was to be compensated in damages; and this, as I understand it, is the exact theory of the common law. I may add that this case appears to have been understood in this sense by all the judges in this country who have referred to it.

I shall not pursue my examination of the cases decided in the courts of this country in further detail. In my opinion, the decisions in the States of Indiana, California, Michigan and Louisiana all rest for their vindication on the doctrine that the *de facto* officer is liable in an action to the *de jure* officer for his intrusion, irrespectively of the consideration whether such intrusion was perpetrated in the consciousness of doing an unlawful act. I am aware that in each of these

states there is a statute relating to the subject, but it does not seem to me that such provisions touch or affect the question under consideration, for they provide merely a mode by which the lawful officer can, in an easy manner, assert his rights, leaving the point with respect to the damages to be ascertained on common law principles; and that point, as I have already remarked in my reference to the case of United States v. Addison, embraces the whole subject of the controversy. That such was the opinion of the judges in these several states is, it seems to me, undeniably clear, from their treatment of the subject, for they cite the English cases, and take them as their guides.    The cases to which I refer are the following: Glascock v. Lyons, 20 Ind. 1; Douglass v. State, 31 Ind. 429; People v. Miller, 24 Mich. 458; Dorsey v. Smith, 28 Cal. 21; Pettit v. Rousseau, 15 La. Ann. 239; Sigur v. Crenshaw, 10 La. Ann. 297.

The foregoing are the decisions in this country which, according to my understanding, very plainly sanction and maintain the rule in regard to this matter, which, I have said, is considered by me to be the clearly-established doctrine of the common law.    Nor have I met a single case, or even dictum, having a contrary tendency.    Under such circumstances, even if I disapprove of the rule in question, I should feel constrained to follow the authorities which are so consistent, weighty, and long-continued.

Having concluded my review of what I conceive to be the adjudged law of cases like the present one, I shall conclude my remarks with a brief exposition of my convictions with respect to the legal principles which are necessarily involved in this inquiry.

It will be conceded that a person duly elected to office has a legal right to the possession of such office, and to the opportunity of earning its emoluments.    Unless this be conceded, it will be impossible to justify the assumption of a right of action existing in such person for any violation of his official privileges; for, even if he should be prevented by fraud or force from entering into such office, he would be remediless

with regard to such wrong, unless the right to enter and hold such office be a legal one.   The law affords no remedy whatever, except for the violation of that which itself deems a legal right.   Standing, then, upon the ground that the officer *de jure* has this legal right to the possession of his office, it necessarily follows that the intrusion of another into such possession is a wrong in law, for it would be absurd to assert that the *de facto* officer has the legal right thus to intrude. Contradictory rights of possession cannot co-exist, and, as the lawful officer has the conceded right, the intruder's act must be wrongful.   So far, it is to be presumed, no one will dispute these legal premises.   But it is asserted that, unless the intrusion be consciously wrongful, it is, in a sense, excusable, and no action will lie by reason of it.   But by what course of reasoning is such a result to be reached?   How can the right of the *de jure* officer be imperiled or lost by the mistakes of another person?   Such a doctrine seems to me to be opposed to everything that has the semblance of legal science.   The universal rule is, that the law repairs the damage of the person injured, irrespectively of the motives of the wrongdoer.   This is not a case in which the reciprocal rights of two persons are in conflict, for if it were, then indeed the intention of the doer of the act, resulting in damage, would enter into the problem of legal responsibility.   But the case is the instance of a clear legal right on the one side, and a clear legal, though an unintentional wrong, on the other.   The position that apparently must be maintained, in order to decide this case in favor of the defendant in the action is, that the officer *de facto*, reasonably believing that he has title, may, without being subject to legal liability, destroy the admitted rights of his opponent.   I cannot think that, under any possible circumstances, a legal right is put out of the protection of the law when its destruction is the result of unconscious error.   The only reason that suggests itself for the maintenance of such a theory is the hardship of casting the loss resulting from an act on the person who, when he did it, believed it was lawful.   But, in law, a person must bear the

consequences of his own mistakes; he cannot claim to be erroneous at the expense of others.   The maxim is, that when one of two innocent persons must suffer a loss, he must bear it through whom it occurred.   Let us take an apposite example:   A and B are rival candidates for an office.   A is elected, and, as a preparation to going into such office, yields up some lucrative position held by him; B, in the persuasion that he was elected, gets a commission and takes possession of the post, and so continues for several months, until ousted by legal proceedings.   During this time A has been out of occupation, and thus a loss has been occasioned by the mistake of B.   Upon legal rules, who is to bear such loss?   How is it to be paid?   Is it not to be B, whose mistake has been the cause of such damage?   The fact is, it is obvious that the principle that, under the given circumstances, will exempt the officer *de facto* from a suit by the person damnified, must be that if an unsuccessful candidate honestly believes, on reasonable grounds, that he is chosen to the office, he has a lawful right to take possession of it.   Such a title would be constituted of a man's belief, plus reasonable grounds for such belief.   Where can it be found that, in law, such a title was ever permitted to override the legal title?

I am not unmindful of the fact that in many of these cases of the class under consideration, instances of real hardship will occur.   That one person shall do all the labors of an office, and that the remuneration for such labors shall pass to another person, who has performed no services, is, undoubtedly, in some instances, an undesirable result.   But such injustices are not peculiar to this one class of cases; they obtain in that vast field embracing those innumerable instances in which persons, from erroneous conclusions as to their own rights, do acts detrimental to the legal interests of others.   The man who believes he has the legal title to land, cultivates and improves it at great expense, loses his labor and his money, if turned out of possession under a paramount title.   So the same result follows, if an article be purchased and paid for, if the title of the seller prove invalid.   The man who does

labor in improving the property of another, in the mistaken belief that he is authorized to perform such services, cannot claim compensation for such work. Under all such conditions there is a hardship, but such incidents are the inevitable consequence of the necessity that exists of establishing general regulations for the government of society. Laws, for the most part, in their operation, must comprehend a great number of transactions, and it is safe to say that there is no such law which, under some circumstances, does not produce inequitable situations. Such results are regarded as unavoidable imperfections in the law, and which, in reality, are insignificant in comparison with the benefits which, as a general rule, are effected by it. The general legal principle, which takes in the present case and so many others in various departments of the law, is the proposition that the legal rights of one person cannot, without a right to redress, be affected injuriously by the mistakes of others, is one of obvious utility, which could not be abolished without materially impairing our legal system. Even as applied to such instances as the one now before the court, it does not appear that the rule has ever been deemed impolitic. It has existed and been enforced in England for over three hundred years, and I have not met any censure or complaint with respect to its effect; and by the courts of this country it has been adopted without any intimation that it was oppressive in its operation. Indeed, its reception here has been so far from being attended by any marks of disfavor, that the contrary seems to have been the case, for in at least three of the states new methods for its enforcement have been created, and the further utility of the principle is thus vindicated by the Supreme Court of Louisiana. After deciding that an action similar to the present one would lie in the case referred to, it says : " We may add that a contrary conclusion would be clearly against public policy; for it would be an encouragement to the usurpation or wrongful retention of public offices, thus frustrating the will of the people, or those to whom they have delegated the appointing power. It is no excuse against such a claim that

the constitutional question on which the right to office turned was *res nova,* and divided the opinions of the public and the judiciary. Such considerations may shield any defendant from the moral imputations, but does not touch the legal liability to account for the fees received."

From the considerations above expressed, I am constrained to vote to reverse the judgment in the present case.

*For affirmance*—THE CHANCELLOR, MAGIE, PARKER, VAN SYCKEL, CLEMENT, GREEN, WHITAKER.    7.

*For reversal*—THE CHIEF JUSTICE, DIXON, REED, SCUDDER, COLE.    5.