WALTER G. WINNE, PLAINTIFF-RESPONDENT, v. THE COUNTY OF BERGEN, A BODY POLITIC AND CORPORATE OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued February 6, 1956—Decided March 26, 1956.

312

Mr. *Milton T. Lasher*, Bergen County Counsel, argued the cause for the appellant.

Mr. *Walter D. Van Riper* argued the cause for the respondent (*Messrs. McGlynn, Weintraub & Stein*, attorneys; *Mr. Edward R. McGlynn*, of counsel).

The opinion of the court was delivered by

JACOBS, J.  In an opinion reported at 36 *N. J. Super.*
532 (1955), the Bergen County Court held that the plaintiff,
formerly prosecutor of Bergen County, was entitled to re-
cover $34,005.32 from the County of Bergen for salary as
county prosecutor from December 1, 1950 to April 25, 1954,
during which period he performed no public services because
the Attorney-General had taken over the county prosecutor's
duties pursuant to *R. S.* 52:17A-5. The County appealed
to the Appellate Division and we certified under *R. R.*
1:10-1(*a*).

On April 25, 1949 the plaintiff was appointed prose-
cutor of Bergen County for a period of five years. His salary
was fixed by the board of chosen freeholders of the county
at the sum of $10,000 per annum. He performed his duties
as prosecutor until December 1, 1950. On that day the
board adopted a resolution which set forth that: Whereas
the Attorney-General had on October 20, 1950 assumed
jurisdiction in Bergen County over the investigation of gam-
bling activities; and whereas the investigation had assumed
major proportions and it appeared that it would be wise for
the State to assume the full responsibility for the operation
of the office of prosecutor in Bergen County; therefore be
it resolved that the Attorney-General be requested "to assume
immediately the full responsibility for the prosecution of all
criminal business in this County." On the same day, an
Assistant Attorney-General took possession of the prosecutor's
office and thereafter all of the criminal business of the county
was conducted by him to the prosecutor's exclusion. The
plaintiff does not now, nor has he at any earlier stage, ques-
tioned the constitutional or statutory propriety of the
resolution of the board of chosen freeholders or the action of
the Attorney-General pursuant thereto. We assume that the
board's resolution and the Attorney-General's action were
properly grounded and motivated and were compelled by the
public interest; the plaintiff has made no showing or sug-
gestion to the contrary, and would not, in any event, be
permitted at this late date to attack them collaterally.  *Cf.*

*Keegle v. Hudson County,* 99 *N. J. L.* 26 (*Sup. Ct.* 1923), affirmed 102 *N. J. L.* 219 (*E. & A.* 1925). It is conceded that the plaintiff performed no services whatever as county prosecutor from December 1, 1950 until his five-year term expired on April 25, 1954.

On April 21, 1955 the plaintiff filed his complaint in the County Court seeking judgment against the defendant County of Bergen for salary as prosecutor from December 1, 1950 to April 25, 1954. The defendant filed its answer denying liability and setting forth various separate defenses. On cross-motions for summary judgment the County Court denied the defendant's motion, granted the plaintiff's motion, and entered judgment accordingly. In its brief and appendix on appeal the defendant has referred to matters which the plaintiff describes as immaterial and scandalous and he has moved to suppress them; we have disregarded the matters which the plaintiff considers objectionable and there is no need to deal further with his motion.

Our recent opinion in *De Marco v. Board of Chosen Freeholders of County of Bergen,* 21 *N. J.* 136 (1956), contains a full discussion of the general principles which are controlling here. De Marco, a Bergen County detective, had been suspended pending trial on an indictment which was ultimately dismissed. After reinstatement he sought to recover salary for the period of his suspension but his claim was rejected in the Law Division. In affirming, we pointed out that the well-settled common-law principle in New Jersey is that a public officer's right to compensation grows out of the rendition of the services of his office (*Mayor, etc., of City of Hoboken v. Gear,* 27 *N. J. L.* 265, 279 (*Sup. Ct.* 1859); *Stuhr v. Curran,* 44 *N. J. L.* 181, 191 (*E. & A.* 1882)); that the emoluments of a public office are bestowed on the person "who performs the services and not upon one who has failed to perform the services, except as under statutory legislation it is otherwise provided" (*Hillel v. Borough of Edgewater,* 106 *N. J. L.* 481, 483 (*E. & A.* 1930)); that statutes which are advanced as changing the common-law principle are to be strictly con-

strued (*Hart v. Borough of Hawthorne*, 120 *N. J. L.* 27, 30 (*Sup. Ct.* 1938), affirmed 121 *N. J. L.* 135 (*E. & A.* 1938); *Strohmeyer v. Borough of Little Ferry*, 136 *N. J. L.* 485 (*E. & A.* 1848)); and that none of the legislative enactments invoked by him (*R. S.* 40:46–34, *N. J. S.* 2A:135–9, *N. J. S.* 2A:157–4, *R. S.* 11:4–3.6) was sufficiently comprehensive to support his claim for recovery of salary for the period during which he performed no public services because he was under suspension.

The plaintiff contends that the *De Marco* case is inapplicable because it dealt with a non-constitutional office whereas the plaintiff held a constitutional office; however, our common-law cases and the policy which underlay them gave no recognition to any such distinction. The *Constitution of* 1947 does provide that county prosecutors shall be appointed by the Governor with the advice and consent of the Senate for terms of five years (*Art.* VII, *Sec.* II, *par.* 1) but it does not set forth their duties or compensation nor does it contain any provision against reduction of compensation during their terms of office. *Cf. Art.* VI, *Sec.* VI, *par.* 6; *State v. Longo*, 136 *N. J. L.* 589, 592 (*E. & A.* 1947). We assume, as the plaintiff urges, that his office could be terminated only by impeachment pursuant to *Art.* VII, *Sec.* III, *par.* 1 (but *cf. N. J. S.* 2A:135–9) and that any steps aimed at circumventing the prescribed method would be stricken by the courts. In the instant matter, however, the plaintiff's office was not terminated by the Attorney-General's action and no steps aimed at circumventing the Constitution were ever taken. *Cf. Appeal of Margiotti*, 365 *Pa.* 330, 75 *A.* 2d 465 (1950). We find nothing in the terms of the Constitution or in its history which suggests any deliberate purpose to abrogate the long line of New Jersey decisions which upholds the doctrine that, apart from legislation, a public officer who does not actually function as such and who performs no public services may not prevail in an action for compensation. The plaintiff's notion that the earlier cases dealt with "suspensions from positions or employments" as distinguished from suspensions from "offices" is entirely

groundless; indeed in *Ross v. Board of Chosen Freeholders of Hudson*, 90 *N. J. L.* 522 (*E. & A.* 1917), the court expressed the view that they dealt solely with public offices and had no relation to positions and employments. See *Glasser, A New Jersey Municipal Law Mystery: What is a Public Office*, 6 *Rutgers L. Rev.* 503, 521 (1952).

At the oral argument of the plaintiff's appeal his counsel conceded that his claim for salary could not now be supported on common-law principles and that it must rest on legislative enactments. He relied on *N. J. S. A.* 52:17A–5 although the County Court had placed additional reliance on other statutes, namely, *R. S.* 2:182–10; *N. J. S.* 2A:158–10; *R. S.* 2:182–11; *N. J. S.* 2A:158–13; *R. S.* 2:182–12; *N. J. S.* 2A:158–14. We shall review these enactments individually, in the light of the principles embodied in the *De Marco* case, *supra*.

*N. J. S.* 2A:158–10 (formerly *R. S.* 2:182–10) provides that in counties in which there are two or more judges of the County Court, the prosecutors shall receive annual salaries of not less than $7,500 nor more than $10,000 as fixed by resolution of the board of chosen freeholders; and *N. J. S.* 2A:158–13 (formerly *R. S.* 2:182–11) provides that the salaries of prosecutors shall be paid at the same time and in the same manner as other county salaries are paid. These statutes do not bear on the question of whether a county is obligated to pay a prosecutor's salary when it was not actually earned because the prosecutor had been displaced by the Attorney-General. It may be assumed that in the common-law cases which denied recovery to public officers, the annual salaries and the time for payment had comparably been fixed by or pursuant to legislative authority. See *De Marco v. Board of Chosen Freeholders of County of Bergen, supra*.

*N. J. S.* 2A:158–14 (formerly *R. S.* 2:182–12) had its beginnings in *L.* 1932, *c.* 222, *p.* 498. It was originally introduced as a Senate Bill by Senator Ely of Bergen County and its purpose as expressed in the introducer's statement was "to authorize and provide for the suspension of. the

payment of the salary of the prosecutor of the pleas of any county when he has been superceded by the Attorney-General, and such supercedure has extended for a period of more than three months." At that time the duties of the Bergen County prosecutor were actually being performed by the Attorney-General; in referring to Senator Ely's bill the *Trenton Times* issue of June 10, 1932 had this to say:

"Senator Ely put through both branches a measure which would eliminate the salary of any county prosecutor at the end of three months in the event he is superceded by order of the court. It is designed to deal with a situation in Bergen County where Prosecutor Edward O. West has been drawing salary for nearly two years while the work of the office has been in charge of an assistant attorney general."

■■ The 1932 enactment was a supplement to "An act respecting prosecutors of the pleas of the State" and contained two paragraphs. In the first paragraph the Legislature provided that whenever the Attorney-General shall "at the request of a justice of the Supreme Court" attend in any county for the prosecution of the criminal business therein and shall continue therein for more than three months the prosecutor's salary "shall be suspended" until the Attorney-General terminates his attendance and the prosecutor reassumes his duties. The second paragraph contained a provision that when the period of suspension of payment has ended "the total amount of such salary or other compensation held in suspense shall be paid to the said prosecutor of the pleas." The 1932 enactment became *R. S.* 2:182–12, but when it was replaced in 1951 (effective January 1, 1952) by *N. J. S. 2A*:158–14 the Legislature omitted the last quoted language relating to payment to the prosecutor after the period of suspension of payment has ended.

We reject the plaintiff's contention that the 1932 enactment was merely intended to defer the time of payment and we likewise reject his contention that the language omitted in 1951 was exscinded solely because it was considered surplusage. If the 1932 legislation is interpreted to have done

nothing more than defer the time for payment then it accomplished substantially nothing of public value and in nowise met the particular evil of dual compensation at which it was aimed; we would not be justified in giving it such a narrow and frustrating construction. See *Valenti v. Board of Review of U. C. C. of N. J.*, 4 *N. J.* 287, 291 (1950); *Giordano v. City Commission of City of Newark*, 2 *N. J.* 585, 594 (1949). In the *Valenti* case Justice Heher noted that the motive which led to the making of a law is one of the most certain means of establishing its true sense; and in the *Giordano* case Justice Oliphant remarked that in order to avoid an anomalous or absurd result the spirit of a law will be permitted to control its letter. It seems evident that the Legislature anticipated that there would be circumstances in which a displaced prosecutor would have no just claim for compensation. It contemplated that payment to the prosecutor would be made for the first three months during which the Attorney-General would be in fair position to investigate and determine whether the public interest required his continuance in attendance; and that thereafter the prosecutor's salary would be suspended for ultimate payment if, but only if, he was justly entitled to such payment. Thus, if at the Attorney-General's request he continued to aid in the performance of the duties of the prosecutor's office, he would be entitled to receive compensation upon the Attorney-General's retirement; on the other hand if the duties of the prosecutor's office were carried on by the Attorney-General to the complete exclusion of the prosecutor then the compensation would not be payable. We take the 1951 omission to have been a deliberate one calculated to reenforce an interpretation of the statute in the public interest along the lines indicated. See *State v. Barts*, 132 *N. J. L.* 74, 80 (*Sup. Ct.* 1944), affirmed 132 *N. J. L.* 420 (*E. & A.* 1945); *City of Augusta v. Inhabitants of Town of Mexico*, 141 *Me.* 48, 38 *A. 2d* 822 (1944); 1 *Sutherland, Statutory Construction* (*3rd ed.* 1943), § 1930.

The plaintiff makes no claim for partial or total compensation under the 1932 enactment and its revisions and

points out that they were confined to instances where the Attorney-General acted at the court's request whereas in the instant matter he acted at the request of the board of chosen freeholders under *N. J. S. A.* 52:17A–5. This latter statute had its origin in *chapter* 20 of the *Laws of* 1944. It was entitled "An Act to establish a Department of Law in the State Government" and although there was no introducer's statement the act itself set forth in paragraph 1 that its purpose was "to accomplish economy and efficiency by centralizing, in one department, the facilities afforded by the State for the rendering of legal services to the Governor and to all officers, departments, boards, bodies, commissions and instrumentalities of the State Government and to provide for the enforcement of the criminal law of the State by such department where the ends of justice so require." Paragraph 5 of the act provided that whenever the Attorney-General attends in any county, at the request of the Governor or a justice of the Supreme Court or the board of chosen freeholders, for the prosecution of the criminal business therein, or part thereof, the Attorney-General shall have all the power and authority of the prosecutor. It also provided that the treasurer of the county shall pay for the services of the Attorney-General in an amount not exceeding that provided by law for the payment of the prosecutor for similar services and that "no compensation so allowed shall affect the salary of the prosecutor" in said county. It is this last quoted language which was casually referred to in *State v. Winne,* 12 *N. J.* 152, 172 (1953), and which was the foundation of the oral argument by the plaintiff's counsel before this court. We believe that it may not properly be given the sweeping interpretation advanced by him and embraced in the opinion of the County Court (*cf. De Marco v. Board of Chosen Freeholders of County of Bergen, supra; Hart v. Borough of Hawthorne, supra; Strohmeyer v. Borough of Little Ferry, supra*); on the contrary we believe that it is properly to be interpreted as providing that the compensation allowed to the Attorney-General shall not affect

the salary of the prosecutor if such salary was otherwise payable.

*N. J. S. A.* 52:17A–5 was simply an administrative act which reorganized the State's legal facilities and concentrated them in a newly created Department of Law. Nowhere in its terms do we find manifested any legislative purpose aimed at altering the established common-law doctrine that public officers who do not actually function as such and perform no public services may not recover in actions for compensation. And nowhere do we find any intent to impair *R. S.* 2:182–12 (now *N. J. S.* 2A:158–14) with which we have dealt earlier in this opinion. If the interpretation advanced by the plaintiff were accepted then *N. J. S.* 2A:158–14 would indeed have little effect and the county prosecutor would have been singled out as the only state or county official immune from the common-law principles applied in *De Marco.* In the case before us it would subject the county to a heavy expenditure for salary though it received no corresponding services, and would do so without any showing ever having been made that the public needs had not dictated the plaintiff's original and continued displacement, or that the plaintiff, during the period of his displacement, had been deprived of fair opportunities for full earnings in his private capacity. It seems apparent to us that such a far-reaching result should be pronounced only upon the basis of a compelling statutory direction which may not fairly be inferred from a general enactment which was designed to establish the State's Department of Law and referred only incidentally to the matter of compensation to county prosecutors. See *De Marco v. Board of Chosen Freeholders of County of Bergen, supra.* We accept the county's view that this legislative reference was intended to apply to prosecutors who continue at the Attorney-General's request to aid in the performance of their public duties and not to prosecutors who are properly excluded by the Attorney-General, perform no public services, and may not justly claim compensation.

In English common law the Attorney-General was the chief law officer and legal adviser of the Crown and when

the American colonies separated they generally embodied a comparable office in their governments. See *Wilentz v. Hendrickson*, 133 *N. J. Eq.* 447, 454 (*Ch.* 1943), affirmed 135 *N. J. Eq.* 244 (*E. & A.* 1944); *Public Utilities Com'rs v. Lehigh Valley R. Co.*, 106 *N. J. L.* 411, 413 (*E. & A.* 1930). New Jersey's Constitution of 1776 contained a reference to the office of Attorney-General and until 1812 the practice was to have the Attorney-General prosecute the pleas in all counties, either in person or through deputies chosen by him and serving at his pleasure. In 1822 legislation was passed relating to the appointment of prosecutors for the various counties; it provided that the courts in the several counties shall appoint persons to prosecute the pleas of the State in the absence of the Attorney-General and that their appointments shall be for the term of five years. *L.* 1822, *p.* 25. In *State ex rel. Clawson v. Thompson*, 20 *N. J. L.* 689, 690 (*Sup. Ct.* 1846), the court pointed out that both the Attorney-General and the prosecutor of the pleas were officers recognized in the 1844 Constitution and that "the former is the law officer of the State, with power to prosecute the criminal pleas in every county; whilst the power of the latter is confined to the county, for which he is appointed." Many later enactments, which need not be detailed here, were passed bearing on the respective powers of the Attorney-General and the prosecutors of the pleas in the handling of the criminal business of the State; in the ultimate they provided that it shall be handled by the prosecutors of the respective counties except where there was no prosecutor in the county for the time being, or where the prosecutor desired the aid of the Attorney-General, "or as otherwise provided by law." See *R. S.* 2:182–4; *N. J. S.* 2A:158–4; *State v. McFeeley*, 136 *N. J. L.* 102 (*Sup. Ct.* 1947); *State v. Longo, supra; State ex rel. O'Reardon v. Wilson*, 4 *N. J. Misc.* 1008 (*Sup. Ct.* 1926).

Ordinarily our system of law enforcement through county prosecutors works well but there are occasional breakdowns which may require that the public be protected through the intervention of the State's Attorney-General. Although our

statutes do not give the Attorney-General unrestricted power of intervention they do broadly provide that he may displace county prosecutors, in whole or in part, at the request of the Governor or an assignment judge or the board of chosen freeholders. *N. J. S. A.* 52:17A–5; *N. J. S.* 2A:158–4. *Cf. Note, The Common Law Power of State Attorneys-General to Supersede Local Prosecutors,* 60 *Yale L. J.* 559 (1951). The existence of such power may be vital to the well-being of our people but it is not without its dangers for, like other powers, it may be abused and invoked for political or other wholly alien considerations; however, our courts are alert to these dangers and their corrective processes will be available and effective upon a proper showing in a direct proceeding. *Cf. In re Shelley,* 332 *Pa.* 358, 2 *A. 2d* 809 (1938). That the Attorney-General did not abuse his power in displacing the prosecutor in the instant matter is no longer open to question and, under the applicable common-law principles, denial of the plaintiff's claim for salary during the period of his displacement is clearly dictated. In the event the Legislature hereafter decides to abrogate or alter those principles it will undoubtedly do so in unmistakable terms after weighing all of the interests concerned and the need for safeguarding the public against excessive and unjust claims. See *De Marco v. Board of Chosen Freeholders of County of Bergen, supra.*

Reversed, with direction that judgment for the defendant be entered in the Bergen County Court.

WACHENFELD, J. (dissenting). I would affirm the judgment below primarily for the reasons stated by Judge O'Dea at the trial level.

The status of labor and its relation to our community life has undergone marked changes with the passage of the years from the time of the common-law era, and the doctrines then in vogue have long since been outmoded and the principles true as of yesteryear are no longer applicable.

I doubt if the modern, enlightened concept of labor concedes a forfeiture of emoluments when the stoppage of the

work is due to the unjustified interjection of an intervening cause beyond the control of the laborer and without his fault, including an accusation of dereliction of duty subsequently determined to be baseless through the application of judicial processes in a fair trial guaranteed by the Constitution.

In my view, our appraisal as to whether or not the salary here should be paid under the circumstances is wholly nugatory. The payment has been provided for and directed by an act of the Legislature and it is as binding upon us as it is upon the respondent. I cannot join in an adjudication I consider in defiance of a legislative mandate.

*N. J. S. A.* 52:17A–5, under which the Attorney-General was called into Bergen County by the freeholders, provides specifically that no compensation paid to the Attorney-General by the county "shall affect the salary of a county prosecutor." It means just what it says and it could not have been said with greater clarity. To ignore it is to distort its meaning as well as its purpose. It needs no "sweeping" interpretation, as referred to in the majority opinion, to come to such a conclusion. All that is required is a common-sense, practical and realistic appraisal of the everyday use of the English language.

Nor do I agree that this issue, as stated in the majority opinion, was "casually referred to" in *State v. Winne*, 12 *N. J.* 152 (1953). The majority of the court there gave the problem more than a passing nod. It actually stopped for a good look at the language, admitted it didn't like what it saw, but despite its embarrassment it made a frank appraisal, saying, through the Chief Justice, at *page* 172:

"Indeed, under *R. S.* 2:182–2 his salary is not suspended for the first three months that the Attorney-General takes over his duties, and the balance of his salary is payable at the termination of the attendance of the Attorney-General. *N. J. S. A.* 52:17A–5 *is even more favorable to the county prosecutor in providing 'that no compensation so allowed [to the Attorney-General] shall affect the salary of the prosecutor or assistant prosecutors'* * * *."* (Emphasis supplied)

This is hardly in accord with its present version.

The majority says: "We assume, as the plaintiff urges, that his office could be terminated only by impeachment * * * and that any steps aimed at circumventing the prescribed method would be stricken by the courts * * *," but then it asserts that "no steps aimed at circumventing the Constitution were ever taken."

After saying the constitutional officer would be fully protected by the courts, we, the court of last resort, now strip the prosecutor of the emoluments of his constitutional office and do exactly what we said we would prevent others from doing. Of course, our forfeiture of the respondent's office is by indirection, but it will nevertheless in the end prove quite decisive.

If the Legislature had attempted to eliminate the salary rather than specifically provide for its payment as it did, it would have been ineffectual because where an office is created by and an incumbent is appointed for a term of years under a Constitution, he can be removed only by impeachment and the Legislature may not by indirection circumvent these provisions.

To deprive the incumbent of the emoluments of his office by judicial decree, as the majority is doing here, is to trespass directly and to a destructive degree upon his constitutional rights, which we are, according to all precedent, supposed to protect.

"A constitutional officer may not be legislated out of office and what may not be done directly is likewise prohibited indirectly, as, for instance, by repealing all provisions for the payment of compensation or, in the case of a circuit judge, by abolishing his circuit * * *." 43 *Am. Jur., Public Officers, sec.* 191, *p.* 37.

I would affirm the judgment below.

Justice OLIPHANT joins in this dissent.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, BURLING, JACOBS and BRENNAN—5.

*For affirmance*—Justices OLIPHANT and WACHENFELD—2.