ESTELLE LABA, *ET AL.*, APPELLANTS-CROSS-RESPOND-
ENTS, v. THE BOARD OF EDUCATION OF NEWARK
IN THE COUNTY OF ESSEX, RESPONDENT-CROSS-
APPELLANT.

Argued December 17, 1956—Decided February 4, 1957.

368

*Mr. John O. Bigelow* and *Mr. Emil Oxfeld* argued the cause for the appellants (*Mr. Richard F. Green,* attorney for Perry Zimmerman; *Messrs. Rothbard, Harris & Oxfeld,* attorneys for Estelle Laba).

*Mr. Jacob Fox* argued the cause for the respondent.

*Mr. David D. Furman,* Deputy Attorney-General, argued the cause for the State Commissioner of Education (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

JACOBS, J.    The Newark Board of Education dismissed three teachers (Mrs. Laba, Dr. Lowenstein and Mr. Zimmerman) after they had pleaded the Fifth Amendment during a hearing before a subcommittee of the House Un-American Activities Committee.    On appeal, the State Commissioner of Education determined that the dismissals were contrary to the recent ruling of the United States Supreme Court in *Slochower v. Board of Education,* 350 *U. S.* 551, 76 *S. Ct.* 637, 100 *L. Ed.* 692 (1956), rehearing denied 351 *U. S.* 944, 76 *S. Ct.* 843, 100 *L. Ed.* 1470 (1956); however, he did not order reinstatement of the teachers but remanded the proceedings to enable full and fair inquiry as to their continued competence and fitness to teach in the Newark public school system.    Without awaiting such inquiry or review by the State Board of Education (*R. S.* 18:2–4; *R. S.* 18:3–15) and without obtaining court leave (*R. R.* 4:88–8(*b*)) the teachers appealed to the Appellate Division and the Newark Board cross-appealed.    In view of its public

importance we have certified the matter on our own motion
(*R. R.* 1:10–1(*a*)) and have by-passed preliminary pro-
cedural points. See *Appeal of Pennsylvania Railroad Co.,*
20 *N. J.* 398 (1956); *Waldor v. Untermann,* 10 *N. J. Super.*
188 (*App. Div.* 1950).

Dr. Lowenstein received his B.A. degree from Rutgers
University in 1928, his M.A. from the University of Pennsyl-
vania in 1929 and his Ph.D. from Johns Hopkins University
in 1934. He has taught in the public school system of
Newark since 1935 except for three years when he was in
military service and one year when he was an exchange
teacher at a boys' normal school in southern France. Mrs.
Laba received her B.A. from New York University in 1935
and has taught in the public school system of Newark during
every year since 1935 except for several years when she was
employed at a hospital on a research grant. Both Dr. Lowen-
stein and Mrs. Laba duly acquired tenure protection under
the New Jersey School Laws. See *R. S.* 18:13–16; *R. S.*
18:13–17. Mr. Zimmerman received his B.S. from State
Teachers College at Newark in 1940 and thereafter received
his M.A. from New York University. He began teaching
in the public school system of Newark in 1952 and had
not acquired tenure protection when he was dismissed by
the board. However, in view of the terms of *R. S.* 18:13–11,
all of the parties and the State Commissioner have, for
present purposes, not differentiated his case from the others.
When dismissed by the board, Dr. Lowenstein was teaching
languages at Barringer High School, Mrs. Laba was teaching
biology at Central High School and Mr. Zimmerman was
teaching arithmetic at Dayton Street Public School.

In May 1955 a subcommittee of the House Un-Amer-
ican Activities Committee conducted hearings at Newark.
Representative Clyde Doyle presided and pointed out that the
committee had been charged by Congress with the responsi-
bility of investigating (1) the extent, character and objects
of Un-American propaganda activities in the United States,
(2) the diffusion within the United States of subversive
and un-American propaganda which is instigated from

foreign countries or has a domestic origin, and attacks our form of government as guaranteed by the Constitution, and (3) all other questions in relation thereto that would aid Congress in any necessary remedial legislation. The committee's power to conduct such investigatory hearings in aid of the Congressional legislative function is now beyond question. See *Quinn v. United States,* 349 *U. S.* 155, 160, 75 *S. Ct.* 668, 99 *L. Ed.* 964, 971 (1955); *Barenblatt v. United States,* 240 *F.* 2d 875 (*D. C. Cir.* 1957). *Cf. Eggers v. Kenny,* 15 *N. J.* 107, 114 (1954). Dr. Lowenstein, Mrs. Laba and Mr. Zimmerman were called to testify before the subcommittee and they all appeared on May 19, 1955. They answered preliminary inquiries but then declined, generally after conferring with their counsel, to answer particular questions which bore, *inter alia,* on present and past membership in, or association with, the Communist Party. In one form or another their refusals were rested on the Fifth Amendment of the United States Constitution; their refusals were for the most part honored by the subcommittee and, in any event, they were never cited for contempt. See *Byse, "Teachers and the Fifth Amendment,"* 102 *U. Pa. L. Rev.* 871 (1954); *Finkelhor and Stockdale, "The Professor and The Fifth Amendment,"* 16 *U. Pitt. L. Rev.* 344 (1955). On the same day the Superintendent of Schools of the City of Newark suspended them (*R. S.* 18:6–42) and four days later he preferred charges which referred to their refusal to testify before the House subcommittee and alleged that such conduct constituted just cause for dismissal under *R. S.* 18:13–17. A hearing on the charges was held before the Board of Education of Newark and a fair reading of the transcript indicates that the single issue under consideration was whether the refusal to testify before the House subcommittee, in itself, constituted just cause for dismissal under *R. S.* 18:13–17 which provides that teachers under tenure shall not be dismissed "except for inefficiency, incapacity, conduct unbecoming a teacher or other just cause." Counsel for the board repeatedly pointed out during the hearing that the sole charge was that

the teachers had refused to talk when they should have, that they thereby lost their usefulness and fitness as teachers, and that that was "the only issue." At one point he remarked that the teachers were charged with having "refused to talk at a certain place"; that it would be no defense for them to assert that they were good teachers and were not Communists; that it would, however, be a defense if they established that the record of their refusals to testify was wrong; and that none of them could "offer any evidence on that except I did or didn't refuse to testify. The rest of it is argument." During the hearing the teachers did offer to answer one, though only one, question which was apparently designed to elicit that they were not then Communists; the offer was declined.

■ At the conclusion of the hearing the board, by a vote of five to four, sustained the charges against the teachers and dismissed them as of May 19, 1955. They appealed to the State Commissioner of Education in accordance with *R. S.* 18:3–14. The State Commissioner took no additional testimony but he did have a complete transcript of the proceedings before the board. A hearing was held on September 15, 1955 before the Assistant Commissioner. All counsel argued and briefs were filed by the parties as well as various *amici curiae.* On May 9, 1956 the State Commissioner filed his formal decision which remanded the matter for further proceedings before the board. He noted that the evidence before the board had consisted of little more than the transcript of the House subcommittee hearing; that no other inquiry whatever had been made as to the "fitness" of the teachers; that "no evidence was adduced as to what the appellants' affiliations were in fact, or as to their reasons or justifications for exercising their constitutional privileges"; and that the board had "rested its decision squarely on the proposition that in a Congressional inquiry into Communism and subversion generally, where a witness is questioned as to his affiliations and associations, his invoking the privilege against self-incrimination is *per se* conduct unbecoming a teacher and just cause for his dismissal under *R. S.* 18:13–17."

He then recognized that the board's action would fly directly in the face of the Supreme Court's decision in the *Slochower* case which, though it was rendered after the board had taken its action, was fully binding upon him as it is upon us. Accordingly, he set aside the board's decision though, in view of the acknowledged need for keeping sensitive areas, such as the public school systems, wholly free from subversive elements which seek the overthrowal of our free society, he did not order immediate reinstatement of the teachers but remanded the proceedings for appropriate inquiry by the supervisory school authorities of Newark. See *Thorp v. Board of Trustees of Schools for Industrial Ed.*, 6 *N. J.* 498, 513 (1951), judgment vacated as moot, 342 *U. S.* 803, 72 *S. Ct.* 35, 96 *L. Ed.* 608 (1951), where this court sustained the constitutionality of New Jersey's statutory requirement that public school teachers take a prescribed oath of allegiance which disavows membership in or affiliation with organizations (such as the Communist Party) which advocate governmental changes by force or violence. See *Dennis v. United States,* 341 *U. S.* 494, 71 *S. Ct.* 857, 95 *L. Ed.* 1137 (1951). Compare *Garner v. Board of Public Works of City of Los Angeles,* 341 *U. S.* 716, 71 *S. Ct.* 909, 95 *L. Ed.* 1317 (1951), with *Wieman v. Updegraff,* 344 *U. S.* 183, 73 *S. Ct.* 215, 97 *L. Ed.* 216 (1952). In the *Thorp* case, *supra,* Justice Heher had the following to say for all members of this court:

"The maintenance of the purity of the educational process against corruption by subversive influences is of the highest concern to society. It is in no real sense a denial of academic freedom to require of a teacher, as a condition to employment, a sworn disavowal of allegiance to the doctrine of force or violence as a mode of overthrowing government. That would seem to be axiomatic. Loyalty to government and its free democratic institutions is a first requisite for the exercise of the teaching function. Freedom from belief in force or violence as a justifiable weapon for the destruction of government is of the very essence of a teacher's qualifications. The apprehended danger is real and abiding. We have long had evidences of the pressure here of a godless ideology ruthlessly fostered by a foreign power which has for its aim the violent overthrow of government and free society. And one of the weapons is the debasement of teaching as a softening measure in the consummation

of the subversive process. The school system affords the opportunity and means for subtle infiltration. There is no intrusion upon personal freedoms when government intervenes, as it has here, to avert this peril to its very existence. A teacher who is bereft of the essential quality of loyalty and devotion to his government and the fundamentals of our democratic society is lacking in a basic qualification for teaching. The teacher is not obliged to take the oath; but if he refuses to do so he is not entitled to teach. In the current struggle for men's minds, the State is well within its province in ensuring the integrity of the educational process against those who would pervert it to subversive ends."

In his decision, the State Commissioner suggested that, consistent with *Slochower* and the earlier Supreme Court opinions in *Adler v. Board of Education*, 342 *U. S.* 485, 72 *S. Ct.* 380, 96 *L. Ed.* 517 (1952) and *Garner v. Board of Public Works of City of Los Angeles, supra,* there were open to the board the following courses or a combination thereof: (1) it could conduct "its own inquiry into alleged subversive activities or affiliations of the appellants"; refusal to answer in such inquiry would constitute just cause for dismissal (*cf. Thorp v. Board of Trustees of Schools for Industrial Ed., supra*); and (2) it could itself investigate the refusal of the appellants to testify before the House subcommittee "going into such factors as the subject matter of the questions, the remoteness of the period to which they are directed, the existence of justification for exercising of the privilege, and the reason or reasons why the appellants made the plea"; it was the State Commissioner's view, as indicated in his brief before this court, that if such second line of inquiry disclosed that their refusals to answer before the House subcommittee were patently "frivolous or contumacious" there would likewise be just cause for dismissal. *Cf. Slochower v. Board of Education, supra*, 350 *U. S.*, at *page* 558, 76 *S. Ct.*, at *page* 641, 100 *L. Ed.*, at *page* 700. Although the State Commissioner did not mention them, reference may appropriately be made to the paths suggested in earlier statements by outstanding educators throughout the country. Thus the American Association of University Professors had expressed the view that invoking the Fifth Amendment was not "in and of itself" justifiable cause for

dismissal but cautioned that its stand was not to be construed as advising or generally approving such action by teachers under investigation. The Association of American Universities had voiced the opinion that "invocation of the Fifth Amendment places upon a professor a heavy burden of proof of his fitness to hold a teaching position and lays upon his university an obligation to re-examine his qualifications for membership in its society." And in 1953 the Association of American Law Schools' Committee on Academic Freedom and Tenure[1] had prepared a comprehensive report on the subject; it took the position that a faculty member could not rightly be dismissed "solely because he refused on Fifth Amendment grounds to answer the questions of a legislative committee"; it stressed, however, that a faculty member is not justified in withholding information in any interview or hearing conducted by his own academic institution and made the following comments which bear on the particular lines of inquiry suggested by the State Commissioner:

"Whether a faculty member who has refused to answer a legislative question may be found unfit for his post can be determined only by an investigation of all the relevant circumstances, including the individual's entire record as a teacher and scholar and the reasons which prompted his refusal to testify. If the reasons involve a desire to conceal continuing illegal or immoral conspiratorial activity

---

[1] The Committee was composed of the following distinguished legal scholars: Dean and Professor Jefferson B. Fordham, University of Pennsylvania; Professor Lon L. Fuller, Harvard University; Professor Walter Gellhorn, Columbia University; Professor Paul G. Kauper, University of Michigan; Professor Douglas B. Maggs, Duke University; Professor Rollin M. Perkins, University of California at Los Angeles; Professor Don W. Sears, University of Colorado; Professor R. Dale Vliet, University of Oklahoma; Professor Ralph F. Fuchs, Indiana University, Chairman. Although the Committee's report was recommitted, the ensuing Committee's report which was adopted in 1954, adhered to the position that a faculty member's invocation of the Fifth Amendment would not "in and of itself" constitute ground for dismissal but was sufficient to call for a general fitness inquiry by his educational institution. *Association of American Law Schools, Proceedings* 44 (1953); *Id., Proceedings* 20, 115 (1954).

of the faculty member or of others, an adverse judgment may of course be reached. If the reasons lay in confusion or fear produced by the investigation, they may have little bearing upon the faculty member's fitness; if they involved sincere ethical or political principles, their bearing will hardly be adverse. If the witness's refusal to testify resulted from a decision to withhold evidence of his past or present illegal conduct, the question of his fitness turns upon the justifiability of his decision, upon whether the conduct continues, and upon the relevance of that conduct to his academic duties. A good-faith reliance upon the constitutional privilege to remain silent is not misconduct, but contumaciousness toward a legislative committee is and may be weighed in the balance." *Association of American Law Schools, Proceedings* 111 (1953)

*Cf. Association of American Law Schools, Proceedings* 115 (1954); *Id., Proceedings* 119 (1955); *Id., Program and Reports of Committees* 41 (1956); *Academic Freedom and Tenure in the Quest for National Security,* 42 *A. A. U. P. Bulletin* 49 (Spring 1956).

The Fifth Amendment contains the now well-known constitutional privilege (or right) that no person shall be compelled in any criminal case to be a witness against himself. Its origin, history and current application have been extensively dealt with elsewhere. See 8 *Wigmore, Evidence* (3d ed. 1940), §§ 2250–2284; *Morgan, "The Privilege Against Self-Incrimination,"* 34 *Minn. L. Rev.* 1 (1949); *Clapp, "Privilege Against Self-Incrimination,"* 10 *Rutgers L. Rev.* 541 (1956). *Cf. Williams, "Problems of the Fifth Amendment,"* 24 *Fordham L. Rev.* 19 (1955); *Claflin, "The 1956 Ross Essay—The Self-Incrimination Clause,"* 42 *A. B. A. J.* 935 (1956). Although some have traced the privilege to the 12th Century and the inquisitorial practices of the Ecclesiastical Courts its significant beginnings in the common law may be said to have occurred in the 17th Century. It had been customary to make the accused person give evidence against himself and there are frightening descriptions of the torturous methods which were actually used. In 1637 "Freeborn John" Lilburn was brought before the Star Chamber for having imported heretical books but refused to take the oath to answer. He was sentenced to be whipped and pilloried and the sentence was actually

carried out. Thereafter in 1641 the House of Commons declared that the sentence was "illegal, and most unjust, and against the liberty of the subject" and ordered that Lilburn be paid a large indemnity. After this occurrence the privilege became entrenched as a vital part of the English common law, was carried over into Colonial American law, was included in the 1776 Virginia Declaration of Rights, and was embodied in the 1791 Bill of Rights of the United States Constitution as an individual safeguard against oppression and harassment by the newly created federal government. In *Twining v. State of New Jersey*, 211 *U. S.* 78, 91, 29 *S. Ct.* 14, 53 *L. Ed.* 97, 103 (1908), Justice Moody pointed out that the privilege was then regarded "as now, as a privilege of great value, a protection to the innocent, though a shelter to the guilty, and a safeguard against heedless, unfounded, or tyrannical prosecutions."

Throughout the years the privilege has survived though it has been by no means free from intermittent attacks. In his article on the subject Judge Clapp cites many of the earlier criticisms by Bentham, Pound, Terry and others. A current attack may be found in *Baker, "Self Incrimination: Is the Privilege an Anachronism,"* 42 *A. B. A. J.* 633 (1956). Cf. *Pittman, "The Fifth Amendment: Yesterday, Today and Tomorrow,"* 42 *A. B. A. J.* 509 (1956). In *Palko v. State of Connecticut*, 302 *U. S.* 319, 325, 58 *S. Ct.* 149, 82 *L. Ed.* 288, 292 (1937), Justice Cardozo acknowledged that, with suitable protection against physical and mental torture, justice may be done under systems (such as prevail in other parts of the world) which contain no immunity from compulsory self-incrimination, and he noted that "there are students of our penal system who look upon the immunity as a mischief rather than a benefit, and who would limit its scope or destroy it altogether." But there are at least equally competent and sincere students who firmly believe otherwise and their views have found favor in recent opinions of the United States Supreme Court. See *Quinn v. United States, supra; Ullmann v. United States,* 350 *U. S.* 422, 426, 76 *S. Ct.* 497, 100 *L. Ed.* 511, 518 (1956);

*Slochower v. Board of Education, supra; cf. State v. Fary,*
19 *N. J.* 431, 434 (1955). In his recent addresses, *"The
Fifth Amendment Today"* (1955), Dean ' Griswold has
forcefully suggested that "the privilege against self-incrimina-
tion is one of the great landmarks in man's struggle to
make himself civilized"; he has pointed out that it may be
invoked not alone by the culpable but also by conscientious
men who are innocent although honestly in fear of the risk
of prosecution; and he has urged that if the privilege· is
to remain effective against the inquisitional dangers which
·it has sought to curb, it must be given comprehensive rather
than narrow application. In the *Quinn* case Chief Justice
Warren approvingly cited Dean Griswold's discussions and
noted that the self-incrimination clause of the Fifth Amend-
ment is entitled to a · liberal construction in favor of the
right it was intended to secure. In the *Ullmann* case Justice
Frankfurter quoted Griswold and stressed that since the
Fifth Amendment represented an important advance in the
development of our liberties it is not to be interpreted in
a hostile or niggardly spirit. And in the *Slochower* case
Justice Clark likewise cited Dean Griswold and vigorously
rejected the notion that only the guilty use the Fifth Amend-
ment; in the course of his opinion for a majority of the
court he said (350 *U. S.,* at *page* 557, 76 *S. Ct.,* at *page*
640, 100 *L. Ed.,* at *page* 700) :

"At the outset we must condemn the practice of imputing a
sinister meaning to the exercise of a person's constitutional right
under the Fifth Amendment. The right of an accused person to
refuse to testify, which had been in England merely a rule of evi-
dence, was so important to our forefathers that they raised it to
the dignity of a constitutional enactment, and it has been recognized
as 'one of the most valuable prerogatives of the citizen.' *Brown v.
Walker,* 161 *U. S.* 591, 610, 825, 16 *S. Ct.* 644, 652, 40 *L. Ed.* 819.
We have reaffirmed our faith in this principle recently ·in *Quinn v.
United States,* 349 *U. S.* 155, 75 *S. Ct.* 668, 99 *L. Ed.* 964. In
*Ullmann v. United States,* 350 *U. S.* 422, 76 *S. Ct.* 497, 100 *L. Ed.*
511, decided last month, we scored the assumption that those who
claim this privilege are either criminals or perjurers. The privilege
against self-incrimination would be reduced to a hollow mockery if
its exercise could be taken as equivalent either to a confession of
guilt or a conclusive presumption of perjury. As we pointed out

in *Ullmann*, a witness may have a reasonable 'fear of prosecution and yet be innocent of any wrongdoing. The privilege serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances. See *Griswold, The Fifth Amendment Today* (1955)."

In *Slochower* an associate professor at Brooklyn College, an institution maintained by the City of New York, had appeared before the Internal Security Subcommittee of the Committee on the Judiciary of the United States Senate and had refused to answer questions concerning his Communist Party membership during 1940 and 1941 on the ground that his answers might tend to incriminate him. Shortly thereafter he was suspended from his position at the college and it was later declared vacant under section 903 of the New York City Charter. That section provided that if any city employee refused to answer questions on the ground that his answers may tend to incriminate him, then his employment would terminate. The New York Court of Appeals sustained Slochower's automatic dismissal and he appealed asserting violation of the Due Process and Privileges and Immunities Clauses of the Fourteenth Amendment. The Supreme Court sustained his claim under the Due Process Clause and adopted or reaffirmed the following principles: A state or its governmental subdivisions may not, without violating the Due Process Clause, dismiss a public employee pursuant to a statute which is patently discriminatory or arbitrary—thus it may not exclude persons from public employment solely on the basis of organizational memberships without regard to knowledge of their unlawful nature. *Wieman v. Updegraff, supra.* It may, however, dismiss public employees who, after notice and hearing, are found to advocate the overthrow of government by unlawful means or who are unable to explain satisfactorily membership in organizations found to have that aim. *Adler v. Board of Education, supra.* Similarly it may inquire of public employees as to matters which relate to their continued fitness to serve as public employees, including past and present membership in the Communist Party and associated organizations, and may discharge employees who fail

380

to disclose pertinent information which the supervising authorities may require. *Garner v. Board of Public Works of City of Los Angeles, supra.* But it may not infer guilt and discharge public employees solely (and without regard to other circumstances) because they exercised their constitutional privilege under the Fifth Amendment before a Congressional investigating committee. See 350 *U. S.* 558, 559, 76 *S. Ct.* 641, 100 *L. Ed.* 700, 701. *Cf. McKay, "Constitutional Law,"* 31 *N. Y. U. L. Rev.* 1358, 1359 (1956); *Note, "The Supreme Court 1955 Term,"* 70 *Harv. L. Rev.* 83, 120–123 (1956); *Note,* 31 *St. John's L. Rev.* 78, 91 (1956); *Note,* 41 *Minn. L. Rev.* 128 (1956); *Note,* 10 *Vand. L. Rev.* 139 (1956); *Note,* 35 *N. C. L. Rev.* 90 (1956); *Note,* 16 *Md. L. Rev.* 259 (1956); *Note,* 25 *Fordham L. Rev.* 526 (1956); *Note,* 54 *Mich. L. Rev.* 126 (1955). See *Board of Public Education School Dist. of Philadelphia v. Beilan,* 386 *Pa.* 82, 125 *A. 2d* 327, 332 (1956). *Cf. Kutcher v. Housing Authority of City of Newark,* 20 *N. J.* 181, 188 (1955). But *cf. Annotation, "Assertion of immunity as ground for removing or discharging public officer or employee"* 44 *A. L. R. 2d* 789 (1955); *Faxon v. School Committee of Boston,* 331 *Mass.* 531, 120 *N. E. 2d* 772, 44 *A. L. R. 2d* 781 (1954); *Davis v. University of Kansas,* 129 *F. Supp.* 716 (*D. C. W. D. Mo.* 1955).

▮▮▮▮ The board seeks to distinguish *Slochower* on the ground that no hearing was there afforded to the professor, whereas here the teachers did have a hearing before the board. But the hearing required by the Due Process Clause, must be, as the court's opinion in *Slochower* indicates, a fair and meaningful one (*cf. Handlon v. Town of Belleville,* 4 *N. J.* 99 (1950)) which does not turn, as did the hearing in the instant matter, exclusively on the single factual issue of whether the teachers did actually plead the Fifth Amendment before the Congressional subcommittee. The fact that they did was never disputed. As in *Slochower* [350 *U. S.* 551, 76 *S. Ct.* 639] there was realistically no "opportunity to explain"; no consideration was given to the controlling

general issue of whether in the light of all the pertinent circumstances the individuals involved were fit to continue in the public school system; no weight was given to "such factors as the subject matter of the questions, remoteness of the period" to which they were directed or "justification for exercise of the privilege"; and it mattered not "whether the plea resulted from mistake, inadvertence or legal advice conscientiously given, whether wisely or unwisely." See 350 *U. S.,* at *558, 76 S. Ct.,* at *page* 641, 100 *L. Ed.,* at *page* 700. The State Commissioner properly found that the board rested its decision on the invalid proposition that the teachers' invocation of the Fifth Amendment before the Congressional committee constituted *"per se* conduct unbecoming a teacher and just cause for his dismissal under *R. S.* 18:13–17." We are satisfied that in the light of the holding in *Slochower,* the proceedings were properly remanded for further inquiry (without reinstatement of the teachers in the interim) and the board has no just or reasonable basis for complaining about his action. See *San Francisco Board of Education v. Mass, Cal.,* 304 *P. 2d* 1015 (December 21, 1956), where the California Supreme Court, in fulfillment of *Slochower,* recently set aside a local board of education's dismissal of a teacher, made after a hearing which was confined to the issue of whether he had in fact pleaded the Fifth Amendment, and remanded the proceeding for a full inquiry before the board.

██ We come now to the several points advanced by the individual teachers in support of their contention that the State Commissioner should not have remanded the proceedings but should have taken final action reinstating them. *R. S.* 18:3–14 provides that the State Commissioner shall decide all controversies and disputes under the School Laws; that the facts shall, if required by the Commissioner, be made known to him by the parties by written statements verified by oath; and that his decision shall be binding "until a decision thereon is given by the state board on appeal." While the statutory language leaves much to be desired it sufficiently evidences the legislative purpose to

set up a comprehensive system of internal appeals with broad powers vested in the administrative tribunals to insure that controversies are justly disposed of in accordance with the School Laws. Absent specific legislative direction, the administrative tribunals may mould their own procedures so long as they operate fairly and conform with due process principles. See *F. C. C. v. Pottsville Broadcasting Co.,* 309 *U. S.* 134, 143, 60 *S. Ct.* 437, 84 *L. Ed.* 656, 662 (1940); *Handlon v. Town of Belleville, supra.* Within the statutory phraseology, an appeal from a determination by a local board of education may readily be permitted to follow a course comparable to the ordinary appeal in our judicial structure. Thus where the original record before the board is wholly adequate the State Commissioner may, after hearing, determine the matter without additional testimony; where further evidence is necessary he may have the record supplemented. See *Schwarzrock v. Board of Education of Bayonne,* 90 *N. J. L.* 370 (*Sup. Ct.* 1917); *R. R.* 4:88–9. In reaching his determination he must, of course, give due weight to the nature of the findings below, although his primary responsibility is to make certain that the terms and policies of the School Laws are being faithfully effectuated. *Cf. Boult v. Board of Education of City of Passaic,* 136 *N. J. L.* 521 (*E. & A.* 1948); *Viemeister v. Board of Education of Prospect Park,* 5 *N. J. Super.* 215 (*App. Div.* 1949). Where he reasonably concludes that his responsibility will best be discharged, not by an immediate final decision, but by a remand for further inquiry before the board, we know of no rational basis for precluding him from taking such action.

The inherent procedural power to remand in the interests of justice has long been applied in the courts. See *Ford Motor Co. v. National Labor Relations Board,* 305 *U. S.* 364, 373, 59 *S. Ct.* 301, 83 *L. Ed.* 221, 229 (1939); *Grant v. Grant Casket Co.,* 137 *N. J. L.* 463, 465 (*Sup. Ct.* 1948), affirmed 2 *N. J.* 15 (1949). Since the creation of our new judicial structure under the 1947 Constitution, court procedures have become more flexible and we have displayed

consistent recognition that they must always conform with good·sense and justice; in appropriate instances this court has not hesitated to remand for further inquiry in the court below even though strict adherence to the procedural niceties might well have dictated another course. See *Devlin v. Surgent,* 18 *N. J.* 148, 153 (1955); *Vacca v. Stika,* 21 *N. J.* 471, 475 (1956). Similarly, this court has acknowledged that if administrative tribunals are to be permitted to function effectively they likewise must have broad powers to adjust their procedures in furtherance of their proper objectives. See *Handlon v. Town of Belleville, supra; Air-Way Branches, Inc. v. Board of Review,* 10 *N. J.* 609, 614 (1952); *In re Plainfield-Union Water Co.,* 14 *N. J.* 296, 305 (1954). In the *Handlon* case we held that the power to reconsider "may be invoked by administrative agencies to serve the ends of essential justice and the policy of the law"; and in the *Air-Way* case we referred to the "enlightened view" that administrative agencies may advance the interests of justice by exercising the powers comparable to those possessed by courts, "of reopening their determinations for further consideration and disposition." See *Forkosch, Administrative Law* 486 (1956); *Davis, Administrative Law* 323 (1951).

The State Commissioner acted well within his authority in remanding the proceedings to the board for further inquiry and, if necessary, for the amendment and supplementation of the charges against the teachers. The power to amend and supplement is widely applied in the courts (*R. R.* 4:15) and may be given even broader scope in this administrative proceeding where the traditional judicial problems of limitations and new causes of ˙action have no bearing whatever. See *Gudnestad v. Seaboard Coal Dock Co.,* 15 *N. J.* 210, 223 (1954). *Cf. Welsh v. Board of Ed. of Tewksbury Tp.,* 7 *N. J. Super.* 141 (*App. Div.* 1950). And we find no error in the State Commissioner's refusal to order reinstatement of the teachers pending further inquiry and determination. While the individual interests concerned are of great importance, society's interest is also

of great importance, and undoubtedly the State Commissioner balanced them conscientiously in reaching his conclusion that the public interest will best be served by a remand for further proceedings without interim reinstatement. On the record before us we cannot say that he erred in his judgment or exceeded his authority. We find nothing of merit in the teachers' point that the further inquiry called for by the State Commissioner should be held before him rather than the Newark school authorities. There is no substantial reason to believe that the local personnel is not sufficiently equipped to conduct a fair and impartial inquiry, or that it will fail to do so in compliance with the principles expressed by the State Commissioner and this court. The School Laws contemplate that where the general issue of fitness is presented the original determination should be made locally with ample safeguards on review before the state school authorities and the courts. See *Russo v. Meyner*, 22 *N. J.* 156, 168 (1956). In the instant matter there has never been any suitable inquiry and determination at the local level, and the State Commissioner, soundly believing that there should be, took the appropriate action.

An attack is made on the sufficiency of the statutory standard which will necessarily guide the Newark board. It is found in *R. S.* 18:13–17 which provides that tenure teachers shall be dismissed only for "inefficiency, incapacity, conduct unbecoming a teacher or other just cause." It has been in our statutes for almost 50 years (*L.* 1909, *c.* 243) and is comparable to the standards embodied in the school tenure enactments of most of the other states. It is, of course, general in terms but measured by common understanding it fairly and adequately conveys its meaning to all concerned. See *Jordan v. De George*, 341 *U. S.* 223, 71 *S. Ct.* 703, 95 *L. Ed.* 886 (1951); *Kovacs v. Cooper*, 336 *U. S.* 77, 68 *S. Ct.* 448, 93 *L. Ed.* 513 (1949); *Ward v. Scott*, 11 *N. J.* 117 (1952); *Berardi v. Rutter*, 42 *N. J. Super.* 39 (*App. Div.* 1956); *State v. Wheeler Auto Driving School, Inc.*, 17 *N. J. Super.* 488 (*App. Div.* 1952). In the *Berardi* case (now on appeal in this court) the Appellate

Division cited many of the statutes and cases which permit removal of public employees for just cause. See *Haight v. Love*, 39 *N. J. L.* 14, 22 (*Sup. Ct.* 1876), affirmed 39 *N. J. L.* 476 (*E. & A.* 1877); *Brokaw v. Burk*, 89 *N. J. L.* 132, 135 (*Sup. Ct.* 1916); Heher, J., in *Russo v. Meyner, supra*, 22 *N. J.*, at 179. And in the *Ward* case we referred to the many statutory standards, both federal and state, which have been constitutionally upheld though at least as general in terms. See *Schierstead v. City of Brigantine*, 20 *N. J.* 164, 169 (1955); *Metropolitan Motors v. State*, 39 *N. J. Super.* 208, 213 (*App. Div.* 1956). The courts have found little difficulty in reaching a commonsensible application of *R. S.* 18:13–17. Thus in *Smith v. Carty*, 120 *N. J. L.* 335 (*E. & A.* 1938), a school teacher was found to be unfit to teach in the Paterson school system because she had obtained a loan through actual fraud and misrepresentation; the Court of Errors and Appeals sustained her dismissal upon the finding that the evidence supported the determination of the school authorities that she had been guilty of conduct unbecoming a teacher. In *Harrison v. State Board of Education*, 134 *N. J. L.* 502 (*Sup. Ct.* 1946), the court found that the prosecutrix had evinced resentment of supervision and had repeatedly displayed "a wilful refusal of submission" to the authority of her superiors; it sustained her dismissal for insubordination constituting just cause within *R. S.* 18:13–17. Similarly in *Cheeseman v. Gloucester City*, 1 *N. J. Misc.* 318 (*Sup. Ct.* 1923), the dismissal of a teacher was sustained for insubordination in refusing to obey an order of transfer. On the other hand in *School Dist. of Wildwood v. State Board of Education*, 116 *N. J. L.* 572 (*Sup. Ct.* 1936), there was a summary rejection of the contention that marriage by a teacher may constitute just cause for her dismissal; the court accepted the State Board's position that the statutory reference to other just cause implies " 'a dereliction by the teacher, which may be the subject matter of a charge against her.' " *Cf. Redcay v. State Board of Education*, 130 *N. J. L.* 369 (*Sup. Ct.* 1943), affirmed 131 *N. J. L.* 326 (*E. & A.* 1944).

The very recent decision of the Pennsylvania Supreme Court in *Board of Public Education School Dist. of Philadelphia v. Beilan, supra,* dealt with the dismissal of Mr. Beilan, a teacher in the School District of Philadelphia, who was protected under a state statute against dismissal for reasons other than "incompetency" *etc.* Mr. Beilan had refused to answer questions which were propounded during a private interview with his school superintendent. Thereafter the local board of education conducted a hearing, which was also private at Mr. Beilan's request, and at the conclusion he was dismissed "for refusal to answer pertinent questions bearing directly upon his fitness as a teacher and, therefore, his competency." See 125 *A.* 2*d,* at *page 329.* The Pennsylvania Supreme Court sustained his dismissal, pointing out that, unlike *Slochower,* it was in nowise based upon a refusal to answer during a hearing before a Congressional committee but was based on a finding that he had refused to answer questions relating to his fitness during an interview with his administrative superior. In the course of his opinion for the court Justice Chidsey, after pointing out that incompetency as a cause for dismissal should be given a broad meaning, said:

"Certainly a teacher who refuses to respond to a pertinent inquiry relative to his fitness to teach is not competent within the broad reach of that term, whether the inquiry concerns loyalty or any other proper subject of inquiry. Frankness and cooperation with an administrative superior bear directly upon a teacher's competency. They are as essential in one occupying a post of public trust and civic responsibility as academic qualifications. Can it be seriously argued that where the superintendent of schools has trustworthy information indicating that a teacher has an incurable communicable disease or that he is a peddler of narcotics, or, as here, that he may entertain Communistic ideologies which could be transmitted to the youth in his care, that no inquiry can be made as to the fact and that the teacher is not required to respond. As well stated in the brief of counsel for the appellant: '* * * The State Constitution requires the General Assembly to maintain a thorough and efficient system of public schools [*P. S. Const.* art. 10, § 1]. The School Code is the legislative implementation of this Constitutional duty. The rights and duties of a Superintendent have grown with custom and with professional usage. Many of his duties are imposed on him by tradition. It is one of his duties under the School Code to

make sure that the teaching staff is competent, and therefore to weed out professionally unfit teachers. This is a continuing process that the Superintendent carries on. The Superintendent has the power and the duty, whenever the facts indicate the need, to inquire into and reevaluate the fitness of a teacher.' Unquestionably there is a reciprocal duty on the part of the teacher to fully and frankly cooperate. He may not block such proper inquiry by secretiveness or concealment."

In the report of the Committee on Academic Freedom and Tenure (*Association of American Law Schools, Proceedings* 97 (1953)) the point is made that an investigation of a teacher by his administrative superior is not a traditional adversary proceeding and that a faculty member is not justified in withholding relevant information which is sought during the course thereof. And in response to a contention that the local school superintendent was not the authorized superior to make the initial inquiry the court in the *Beilan* case aptly said:

"Appellee also contends that the Superintendent was not authorized to make the inquiry. There is no more important branch of government than the administration of our public school system. It is a continuing process of education for the maintenance of our democracy. The right of a superintendent of schools to reevaluate a teacher's fitness to be retained in his position is inherent and need not be expressly authorized by statute or local rule or regulation. In a private school the refusal to respond to a pertinent inquiry as to a teacher's fitness made by the superintendent or head of the institution would certainly not be tolerated, but would result in the teacher's discharge. A public school should not be placed in an inferior position in this regard. While the tenure provisions of the School Code protect teachers in their positions from political or other arbitrary interferences, they were not intended to insulate them from proper inquiry as to their fitness and their discharge for failure to cooperate with their superiors in authority to the detriment of the efficient administration of the public school system. The School Code expressly provides that incompetence shall be a cause for dismissal and under the broad meaning properly ascribed to that term, appellee rendered himself incompetent as a member of the school organization."

In the instant matter the State Commissioner suggested courses of inquiry which, after consideration of all the pertinent circumstances, may either satisfy the local

school authorities that one, two or all of the individual teachers are fit to continue to teach in the Newark School System or may indicate the need for further prosecution under *R. S.* 18:13–17 of the present charges, as amended and supplemented. In the light of our controlling legislation it is clear that in this State any person who is now a member of the Communist Party or who is now subject to its ideologies and disciplines is unfit to teach in our public schools and should be dismissed under *R. S.* 18:13–17. See *R. S.* 18:13–9.1; *R. S.* 18:13–9.2; *Thorp v. Board of Trustees of Schools for Induslrial Ed., supra.* The matter may no longer be viewed simply as one of academic freedom of thought and expression, for it has actually become one of self-preservation; we are convinced that Communism is an alien concept which is dedicated to the overthrowal of our form of government, by force if necessary, and seeks to deprive us of the very basic constitutional liberties which we all hold so dear; recent world happenings furnish further evidence of the futility of its solemn promises and the barbarism of its deliberate actions. We have no doubt that in examining into their continued fitness to teach the Newark school authorities may interrogate the appellant school teachers with respect to their present and past association with the Communist Party and affiliated organizations and are entitled to frank and full disclosures. Orderly procedure dictates that the preliminary inquiry on the subject be made fairly and conscientiously by the local school superintendent (*R. S.* 18:4–7; *R. S.* 18:4–10; *R. S.* 18:6–38); his interrogation may also include questions about the teachers' conduct before the House subcommittee, although this inquiry should not be used as a means of undoing the acknowledged constitutional protection of the Fifth Amendment but should be fairly limited and directed towards ascertaining whether the refusals to answer were patently contumacious or frivolous rather than in good faith. See *Association of American Law Schools, Report of the Committee on Academic Freedom and Tenure, Proceedings* 113 (1953); *Byse, supra,* at 881. See also *In re Levy,* 255 *N. Y.* 223, 174 *N. E.* 461 (1931);

*In re Grae,* 282 *N. Y.* 428, 26 *N. E.* 2d 963, 127 *A. L. R.* 1276 (1940). *Cf. Sheiner v. State, Fla.,* 82 *So.* 2d 657 (1955); *In re Holland,* 377 *Ill.* 346, 36 *N. E.* 2d 543 (1941). If after the inquiry it appears that the teachers are now members of the Communist Party or are now subject to its ideologies and disciplines (*Thorp v. Board of Trustees of Schools for Industrial Ed., supra*) or that they have willfully refused to answer pertinent questions fairly submitted by their administrative superiors (*Board of Public Education School Dist. of Philadelphia v. Beilan, supra*) or that they have contumaciously or frivolously refused to answer before the House subcommittee (*In re Levy, supra; In re Grae, supra*) then there would seem to be ample basis for board action within the broad and valid statutory standard embodied in *R. S.* 18:13–17.

The final question requiring our attention relates to the effect of various New Jersey statutory provisions on the further inquiry by the Newark School Superintendent and the Board of Education. Unlike substantially all other states, New Jersey's Constitution contains no express provision embodying the privilege against self-incrimination, although it has always been part of our common law and has been dealt with from time to time in legislative enactments. *State v. Fary, supra,* 19 *N. J.,* at *page* 435; *State v. Toscano,* 13 *N. J.* 418, 423 (1953); *In re Pillo,* 11 *N. J.* 8, 16 (1952); *In re Vince,* 2 *N. J.* 443, 449 (1949); *Bianchi v. Hoffman,* 36 *N. J. Super.* 435, 438 (*App. Div.* 1955). Subject to the requirements of due process, there would appear to be nothing in either our Federal or State Constitution which prohibits our Legislature from curbing the scope of the privilege. See *Twining v. State of New Jersey, supra; Adamson v. People of State of California,* 332 *U. S.* 46, 67 *S. Ct.* 1672, 91 *L. Ed.* 1903 (1947). But *cf. Clapp, supra,* at *page* 570, *note* 116. The first state enactment of any pertinence was contained in an 1849 supplement to the act concerning practice in the courts of law. This represented the first inroad into the now quaint common-law notion that because of their interest parties should not be permitted to

testify; it set forth that a party shall testify when called by the adverse party, but had a proviso that no party shall be compelled to testify "where the action is brought to recover a penalty or to enforce a forfeiture." *L.* 1849, *p.* 265. Three years later the statute was extended to most suits in the Court of Chancery. *L.* 1852, *c.* 119, *p.* 257. In 1855 a report of law commissioners was submitted to the Legislature and pursuant thereto a comprehensive act concerning evidence was adopted. *L.* 1855, *c.* 236, *p.* 668. It extended somewhat the right of a party to testify, set forth that interest shall not disqualify a witness from testifying, and directed that a witness shall not be excused from answering material questions provided "the answers will not expose him to a criminal prosecution or penalty, or to a forfeiture of his estate." In 1871 the Legislature provided that an indicted person shall be admitted to testify at his trial "if he shall offer himself" as a witness in his own behalf. *L.* 1871, *c.* 40, *p.* 12. There were later revisions culminating in the 1951 revision of the statutes relating to the administration of civil and criminal justice; in particular, reference has been made on the teachers' behalf to *N. J. S.* 2A:81–5, *N. J. S.* 2A:81–6 and *N. J. S.* 2A:81–8.

▮▮▮▮▮ *N. J. S.* 2A:81–8, which provides that on the trial of an indictment the defendant shall be admitted to testify if he offers himself as a witness, has no real bearing here. *N. J. S.* 2A:81–6 provides that "in all civil actions in any court of record" a party shall give evidence when called by the adverse party "but no party thereto shall be compelled to be sworn or give evidence in any action brought to recover a penalty or to enforce a forfeiture." Its express terms would seem to indicate its inapplicability in the instant matter. However, *N. J. S.* 2A:81–5 does provide more comprehensively that "no witness shall be compelled to answer any question if the answer will expose him to a criminal prosecution or penalty or to a forfeiture of his estate"; we shall assume that this provision applies fully to proceedings before administrative tribunals as well as judicial tribunals. See *State v. Rixon,* 180 *Minn.* 573, 231 *N. W.* 217, 68 *A. L. R.*

1501 (1930); *Hirshfield v. Hanley,* 228 *N. Y.* 346, 127 *N. E.* 252 (1920). *Cf. Commonwealth v. Prince,* 313 *Mass.* 223, 46 *N. E. 2d* 755, 152 *A. L. R.* 571 (1943), affirmed 321 *U. S.* 158, 64 *S. Ct.* 438, 88 *L. Ed.* 645 (1944). Nevertheless, we are satisfied that a public school teacher may not, during an inquiry as to his continued fitness to teach, decline to answer pertinent questions in reliance on *N. J. S.* 2*A* :81–5 without incurring the danger of a resulting dismissal under *R. S.* 18 :13–17. We incline to reject the teachers' contention that a public school teacher's tenure is "a property right—a part of his estate" and that dismissal of a teacher because of misconduct is a forfeiture of his estate within the meaning of *N. J. S.* 2*A* :81–5. In England, public offices were incorporeal hereditaments and the subjects of vested or private interests, but in the United States, and particularly in our State, they were never viewed as being held by grant or contract and individuals have never had any vested or property rights in them. See *Stuhr v. Curran,* 44 *N. J. L.* 181 (*E. & A.* 1882). *Cf. De Marco v. Board of Chosen Freeholders of Bergen County,* 21 *N. J.* 136, 141 (1956). In *Phelps v. Board of Education,* 115 *N. J. L.* 310, 314 (*Sup. Ct.* 1935), affirmed 116 *N. J. L.* 412 (*E. & A.* 1936), affirmed 300 *U. S.* 319, 57 *S. Ct.* 483, 81 *L. Ed.* 674 (1937), Justice Parker pointed out that the status of tenure teachers was "in essence dependent on a statute, like that of the incumbent of a statutory office, which the legislature at will may abolish, or whose emoluments it may change." *Cf. Thorp v. Board of Trustees of Schools for Industrial Ed., supra,* 6 *N. J.,* at *page* 506. See *Annotation, "Teachers' tenure statutes,"* 127 *A. L. R.* 1298, 1326 (1940); *Emerson and Haber, Political and Civil Rights in the United States* 878 (1952). In *Pfitzinger v. United States Civil Service Commission,* 96 *F. Supp.* 1, 3 (*D. C. D. N. J.* 1951), affirmed 192 *F. 2d* 934 (3 *Cir.* 1951), the court suggested that a federal employee who is called before the Civil Service Commission to account for alleged improper political activity may not assert that he is privileged to refuse to answer because of the danger of the loss of his employment; it

described removal from his position as a "remedial sanction" and noted that "the imposition of such a remedial sanction, although it may be of serious consequence to the person affected, may not be regarded as a forfeiture of a right" but only as "the withholding of a privilege." See also *Application of Delehanty,* 202 *Misc.* 40, 115 *N. Y. S. 2d* 610 (*Sup. Ct.* 1952), affirmed 280 *App. Div.* 542, 115 *N. Y. S. 2d* 614 (*App. Div.* 1952), affirmed 304 *N. Y.* 725, 727, 108 *N. E. 2d* 46 (1952).

Assuming that a teacher's loss of tenure may properly be viewed as a forfeiture of his estate, we still find nothing in the history, purpose or terms of *N. J. S. 2A:81–5* which suggests that it was designed to protect a teacher against dismissal under *R. S.* 18:13–17 where he has refused to answer pertinent questions submitted by his administrative superiors. In the instant matter the teachers' conduct before the Congressional subcommittee reasonably calls for a fitness inquiry during which the teachers have a duty of cooperation and an affirmative burden in the establishment of their fitness. If they choose to remain silent under the protection of *N. J. S. 2A:81–5* they must do so with full realization that their administrative superiors may justifiably conclude that they are no longer fit to teach. See *Board of Public Education School Dist. of Philadelphia v. Beilan, supra. Cf. Brownell, "Immunity from Prosecution versus Privilege against Self-Incrimination,"* 28 *Tul. L. Rev.* 1, 11 (1953); *Orloff v. Willoughby,* 345 *U. S.* 83, 73 *S. Ct.* 534, 97 *L. Ed.* 842 (1953). As the court indicated in the *Beilan* case, *supra,* no private institution of learning would hesitate to proceed expeditiously and reasonably against a teacher who refused to answer pertinent questions during the course of a fitness inquiry and the public interest clearly requires that similar authority be afforded to our public institutions of learning; we find nothing in our statutes which may fairly be construed as evidencing any legislative denial of such power. Indeed, any doubts as to the wishes of our Legislature have largely been dissipated by the tenor of its recent enactments. See *e. g., L.* 1949, *c.* 23, *p.* 70 (*N. J. S. A.*

18:13–9.1, 9.2); *L.* 1953, *c.* 259, *p.* 1759 (*N. J. S.* 2*A*:81–17.1, 17.2). *Cf. L.* 1950, *c.* 210, *p.* 510 (*N. J. S. A.* 40:69*A*–167). The 1953 statute provides that any public employee who refuses, on grounds of self-incrimination, to testify on matters relating to his employment before any body of the State which has the right to inquire under oath into such matters shall forfeit his employment and his right of tenure or pension, provided the inquiry relates to a matter which occurred or arose within the preceding five years. It does not, of course, restrict the pre-existing power of a supervisory school authority to conduct an inquiry into the continued fitness of a teacher but seemingly has the additional effect that if, during the course of such an inquiry, there is a refusal to answer which falls within all of the pertinent terms of the statute, then dismissal is mandatory. We consider it clear that a teacher's fitness inquiry is one which would relate to his employment within the meaning of the 1953 enactment. See *Shlakman v. Board of Higher Education,* 282 *App. Div.* 718, 122 *N. Y. S.* 2*d* 286 (*App. Div.* 1953), affirmed *sub. nom. Daniman v. Board of Education,* 306 *N. Y.* 532, 119 *N. E.* 2*d* 373 (1954), amended 307 *N. Y.* 806, 121 *N. E.* 2*d* 629 (1954), reversed *sub nom. Slochower v. Board of Education, supra.*

"The greatness of the United States has in no small measure been due to the basic freedoms of inquiry and expression which educational institutions at all levels have nurtured and defended so faithfully. The traditions of academic freedom and tenure have been twin bulwarks in the maintenance of strong and independent faculty staffs and it is vital in these times that they not be permitted to wither or decay because of inertia or fear. On the other hand, present world conditions being what they are, it is equally vital that every educational institution rid itself of any faculty member who may justly be deemed no longer competent or fit to teach because of his subversive membership and activity. In recent days many thoughtful and highly respected educators have taken the position that, while the assertion by a faculty member of his constitutional

privilege before a Congressional committee does not constitute an admission of guilt or justify automatic dismissal, it does call for a full and conscientious inquiry as to whether he is qualified to continue in the discharge of his teaching responsibilities at a place dedicated to the advancement of democratic ideals. The like attitude of New Jersey's Commissioner of Education in the instant matter appears to us to be wholly consonant with our organic laws and the public interest and entirely fair to the individuals concerned. Accordingly, his action is in all respects:

Affirmed.

WEINTRAUB, J. (concurring in part). I regret I cannot join completely in the able opinion of Mr. Justice JACOBS. The part of the opinion with which I disagree probably could not influence the outcome of further proceedings in this matter under the facts of the case. Yet it states an important proposition, the consequences of which can hardly be estimated now, and since I cannot agree with it, I feel compelled to state my reasons.

The authorities cited by Mr. Justice JACOBS fully demonstrate that under present circumstances the right to employment as a teacher in a public school system may be denied because of advocacy of the overthrow of our government by unlawful means or membership in an organization known by the teacher to have that aim, and further that a refusal to answer inquiries of the school authorities pertinent to that subject may be the basis of dismissal. Hence I agree the school authorities may interrogate each teacher here concerned with respect to this subject and may conclude, upon a finding of such advocacy or membership or refusal to answer pertinent questions, that a teacher is unfit for continued employment.

I am troubled by so much of the opinion as holds that a teacher may also be dismissed upon a distinctly different basis, namely, a finding that reliance upon the Fifth Amendment before the Subcommittee of the House Un-American Activities Committee was patently contumacious. In short,

although the inquiry into disloyalty in relation to fitness should be resolved in a teacher's favor upon a full examination before the school authorities, yet there may be a dismissal if it be concluded that the exercise of a right in a forum in which it was constitutionally assured was unfounded and contumacious.

I am sure every member of the court regrets as much as I do any limitation upon personal freedoms. Yet the Constitution is intended to be the fabric of government and not its burial shroud. The right of self-defense must be paramount and hence, like it or not, some portion of our liberty may be suspended when the danger is so great as to require it. I say "our" liberty because liberty is truly indivisible, and when it is suspended in any area the finest citizen feels a curtailment of his right to say what he thinks, lest he be enveloped in a smog of suspicion. But it seems to me that just as necessity constitutes the basis for impingement upon freedom, so also necessity marks the limit beyond which we should not go, for to go beyond what the occasion demands is just a waste of liberty.

The necessity here is to protect the school system against subversive infiltration. To that end an inquiry by school authorities into the loyalty of a teacher with power to dismiss for disloyalty or for a refusal to answer fully in that inquiry, is completely sufficient to safeguard the public interest. Should we go further and permit school authorities to pass upon the difficult question whether a constitutional right was contumaciously asserted before a congressional committee?

The majority finds that *Slochower v. Board of Education of the City of New York*, 350 *U. S.* 551, 76 *S. Ct.* 637, 100 *L. Ed.* 692 (1956) permits that further inquiry. I have grave doubt that it does, and I suppose that if it does we would still have the troublesome problem whether as a matter of local law we ought to permit it. The pertinent text of the majority opinion in *Slochower* reads (350 *U. S.*, at *page* 558, 76 *S. Ct.*, at *page* 641):

"With this in mind, we consider the application of § 903 [the New York statute]. As interpreted and applied by the state courts, it operates to discharge every city employee who invokes the Fifth Amendment. In practical effect the questions asked are taken as confessed and made the basis of the discharge. No consideration is given to such factors as the subject matter of the question, remoteness of the period to which they are directed, or justification for exercise of the privilege. It matters not whether the plea resulted from mistake, inadvertence or legal advice conscientiously given, whether wisely or unwisely. The heavy hand of the statute falls alike on all who exercise their constitutional privilege, the full enjoyment of which every person is entitled to receive. Such action falls squarely within the prohibition of *Wieman* v. *Updegraff*, [344 *U. S.* 183, 73 *S. Ct.* 215, 97 *L. Ed.* 216] *supra*.

It is one thing for the city authorities themselves to inquire into Slochower's fitness, but quite another for his discharge to be based entirely on events occurring before a federal committee whose inquiry was announced as not directed at 'the property, affairs, or government of the city, or * * * official conduct of city employees.' In this respect the present case differs materially from Garner, where the city was attempting to elicit information necessary to determine the qualifications of its employees. * * *"

It is not clear whether the first paragraph in the quotation above was intended merely to explain why in principle it is unjust to base a dismissal upon the assertion of the Fifth Amendment, or whether it was intended to suggest that state authorities may conduct an inquiry with respect to the several elements there stated and conclude that there was a contempt of the Congress.

We do not have before us a conviction for contempt. A conviction would present a different situation. And I suppose it must be abstractly conceded that in an administrative inquiry into fitness criminal conduct may be considered even though not reduced to a judgment of conviction. But we are dealing with liberty, the exercise of an important constitutional right, and hence the answer must be found by weighing all the factors and not in a mere mechanical application of a rule which may be indisputable in another setting.

I find it difficult to visualize the course of an inquiry of the kind which the majority authorize. All of the teachers here concerned were represented by reputable counsel. The

record is studded with notations of consultations between the teachers and their attorneys. If it should appear, as now seems evident, that counsel's advice was followed, may the school authorities go further and seek disclosure of what transpired between attorney and client and perhaps then evaluate counsel's application of the difficult rules controlling the availability of the privilege and the loss of it by waiver? Shall school boards pass upon the question of pertinency to the congressional inquiry, or "the remoteness of the period to which the questions were directed" or make their appraisal of whether the answers to the questions would have incriminated or been a link in the chain? What "reasons or justifications for exercising their constitutional privileges" will suffice? I intend no reflection upon the capacity of school authorities as such. My point is that inquiries of this kind would tax the talents of the ablest lawyers and divide them sharply. If there were any necessity for all of this, it would be another matter. But I see no necessity, because the direct inquiry into fitness by the school authorities gives all the protection which the public interest requires.

It is an inescapable fact that the other fellow's liberty is not always popular. The right against self-incrimination is particularly vulnerable today in the hands of the many who do not understand its history and its worth in our way of life. The danger is real that in the fuzzy kind of inquiry of which we are now speaking, the decision will be controlled by an unrevealed dislike for the constitutional right. The views of Mr. Chief Justice Warren in *Quinn v. United States,* 349 *U. S.* 155, at *page* 164, 75 *S. Ct.* 668, at *page* 674, 99 *L. Ed.* 964 (1955), expressed with respect to this right in another context, are appropriate here:

"* * * It is precisely at such times—when the privilege is under attack by those who wrongly conceive of it as merely a shield for the guilty—that governmental bodies must be most scrupulous in protecting its exercise."

It is one thing for the federal government to vindicate the authority of the Congress by prosecuting a charge of

criminal contempt. It is quite another for a state or local agency to probe beneath what on the face of things is simply the assertion of a constitutional right—an assertion which in and of itself imports no impropriety whatever—to determine, on the elusive basis of the factors mentioned, whether the dignity of the Federal Legislature has been offended. It seems to me that a constitutional right should not thus be burdened in the absence of a compelling need, and there is none.

We could well wait for a clarification of the quoted portion of *Slochower,* or at least until we are confronted with a case which imperatively requires a decision by us, and as I see this case, it does not. I say this because in the light of *Quinn v. United States, supra,* it seems inconceivable that the school authorities could find that any of the teachers was guilty of a patent contempt. In that case it was held that the criminal offense is not shown unless the committee informed the witness that his claim of privilege was overruled and directed him to answer. Let us look at the testimony before the subcommittee.

As to Dr. Lowenstein, the record discloses that not a single claim of privilege was overruled and at no point was he ordered to answer. *Quinn* is squarely applicable.

As to Mr. Zimmerman, the chairman (I will assume for present purposes that his action represented the action of the entire subcommittee of two) directed answers to three questions, namely, whether he was a member of a union during the period 1942 to 1948 when he was employed in industry, whether he was a member of the Teachers Union, and whether in the week before the hearing a meeting of school teachers in the area was held at which a lawyer instructed all who were subpoenaed to refuse to answer before the subcommittee. Mrs. Laba was directed by the chairman to answer but two questions, to wit, whether she was ever a member of the American Federation of Teachers during the period she actively engaged in teaching, and whether she is now a member of any teachers' union. But as to the meaty questions relating to past and present

membership in the Communist Party and the like, the subcommittee did not overrule the claim of privilege or order an answer. The charges before the board of education and the findings of the board in the case of each teacher specified only the assertion of the privilege as to questions concerning membership in the Communist Party, and no reference was made to the refusal to answer the questions which the chairman had ordered to be answered. Although the board's charges may now be amended to specify the refusal of Mr. Zimmerman and Mrs. Laba to answer the questions directed to be answered by the chairman, the resulting trial would be so distant from the heart of the matter of fitness as not to be worthwhile.

The majority opinion authorizes an inquiry to ascertain "whether the refusals to answer were patently contumacious or frivolous." Thus far I have construed this to mean only patently "contumacious." If it is intended to suggest there may be a dismissal upon a finding that the refusal was patently "frivolous," meaning thereby something less than a criminal contempt, my disagreement is all the more pronounced. The fuzzy nature of the inquiry would then be even fuzzier. In practical operation, an inquiry into the propriety (non-criminal) of the exercise of a constitutional right can lead only to an unnecessary dilution of that right.

I would modify the State Commissioner's order accordingly.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—6.

*For modification*—Justice WEINTRAUB—1.